UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHARLES DAVID GORDON,

        Petitioner,

    v.

JOE A. LIZARRAGA,

        Respondent.

Case No. 12-cv-00769-PJH

**ORDER DENYING SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS; GRANTING IN PART AND DENYING IN PART CERTIFICATE OF APPEALABILITY**

Before the court is the second amended petition for writ of habeas corpus ("Pet.") pursuant to 28 U.S.C. § 2254 filed by represented state prisoner Charles David Gordon. The briefs are fully submitted and the court determines that the matter is suitable for decision without oral argument. Having reviewed the parties' papers and the record, and having carefully considered the relevant legal authorities, the court DENIES the petition.

## BACKGROUND

**I.    Factual Summary**

The following summary of facts is taken from the decision by the California Court of Appeal on Gordon's direct appeal, based on evidence presented at Gordon's bench trial, which was held September 29, 2009, through October 2, 2009.

*Counts 3, 4 and 5 Against Erica Doe*

Victim Erica Doe (Erica [or Doe No. 2]) met and began dating appellant in October 2002, when she was 16 years old. Their relationship ended in February 2008. They lived together for most of the five years they were together. In June 2003, after living with Erica's parents in Oregon, they moved to American Canyon where they lived with appellant's parents. Appellant had "control of everything" in the

relationship, even insisting that Erica dress him every day. There were instances of violence in the beginning of their relationship, and the violence worsened over time. Erica was afraid of appellant. On numerous occasions, he pushed, slapped and punched her, and threatened to "take [her] out in the woods and make [her] disappear." He also threatened her with a .22-caliber rifle. As a result of the threats, she felt her life was in danger. He would yell at her and call her "bitch," "whore," "cunt," "stupid," and "worthless piece of crap." He gave her a black eye, inflicted bruises, bit her leg, and burned her with a cigarette. Appellant would also be sexually violent toward Erica, forcing sex on her after they fought.

In January 2008, they had a "really bad fight." At about 10:00 p.m., Erica was home with her friend Marlene [Maple] when appellant arrived and started drinking whiskey. He appeared to be angry. Erica wanted to leave with Marlene but thought this would make the situation worse. When Marlene left, appellant said he was angry because Erica had been "unfaithful" to him that day. He began punching her in the ribs and legs, slapped her, pulled her hair, ripped out some of her hair extension braids, called her a whore and told her to go into the bedroom. Despite her telling him to stop, he pulled her clothes off and raped her. After he ejaculated, they both lit up cigarettes. He then told her he was going to burn her with his cigarette. After his first attempt, she moved away. On his second attempt, he burned her thigh, causing a scarring injury.

Five minutes later, appellant told Erica he was going to have anal sex with her to teach her a lesson. Although she begged him not to, he said he was going to do it "whether [she] wanted it or not." He then penetrated her anus with his penis and she loudly screamed for him to stop, hoping someone would come to her aid. He held on to her so she could not pull away, stopping only after he ejaculated. He then told her to "get [her] disgusting ass in the shower." She felt "completely disconnected and scared and just sick." The next day appellant apologized to her. She thought that calling the police would make the situation worse.

After this incident, Erica confided in Marlene, and appellant's mother, Connie Gordon, found out about the incident. When Connie Gordon asked Erica if it was true, Erica revealed the scar on her leg. Connie Gordon told Erica to pack her belongings and drove her to meet Erica's mother, who took Erica to Oregon.

On December 17, 2008, Erica participated in a pretext phone call to appellant that was recorded by the Medford, Oregon Police Department. Erica told appellant she was feeling anxious after having been "beaten and raped and burned." Appellant told her not to "go there this time," said he had apologized and tried to make amends and would not call her any more. He also said: "I know what I fucking did to you. . . . You think it makes me happy? . . . I was fucking crazy. I was fucking out of my mind,

in a place in my life where I was absolutely fucking out of my mind, . . . there's nothing I can fucking do about it now. . . . It's like yes, you were victimized and . . . you were beaten and you were fucking put through hell . . . yes, you were.  I agree with you a hundred percent.  It was wrong and it was fucking horrible, okay?"  Appellant asked Erica to call Jamie (his current girlfriend) and "just tell her I didn't fucking rape you."  Erica responded, "But you did."

*Counts 1 and 2 Against Kelsey Doe*

Victim Kelsey Doe [Doe No. 1], born in 1992, is appellant's niece.  When Kelsey was four or five years old, she visited her grandparents in Oregon and she and appellant were together in a sauna.  Appellant locked her in the sauna for about 30 minutes and said he would not let her out until she "gave him a blow job."  She was frightened but complied, putting her mouth on his penis.  Subsequently, her grandparents came and appellant ran out of the sauna.  Kelsey first told her grandmother about the incident when she was about 15 years old.  The sauna incident did not really affect Kelsey and appellant's relationship; she still considered him one of her best friends and trusted him.  As a teenager, Kelsey liked spending time with appellant because he allowed her to drink alcohol and smoke marijuana.

On November 15, 2008, Kelsey was living with her grandparents in Fairfield and appellant was visiting from Oregon.  Kelsey contacted appellant saying she wanted to see him.  He asked her to "hang out" with him later that night and asked if she had any friends that he could "hook [ ] up with," which Kelsey understood to mean to have sex with.  Appellant said he would get alcohol so they could drink when they arrived at the Napa apartment complex where he was staying.  The apartment complex was managed by appellant's grandfather.

Prior to going to visit appellant, Kelsey was with two of her friends and drank a bottle of malt liquor.  She got a ride to appellant's apartment complex and met him outside.  She was "pretty drunk," and had trouble walking straight.  He took her to a small room off the manager's office.  He offered her whiskey and she drank several shots.  She then felt drunk; she was dizzy, could not think straight, had trouble walking and vomited.  Kelsey gave appellant her cell phone so he could call her boyfriend, Dylan, to pick her up.  Appellant appeared to make the call and then told Kelsey Dylan could not pick her up.  Appellant said he would get her home.

Kelsey kissed appellant on the cheek because he was one of her best friends.  He then began "French kissing" her and said he had had a "crush" on her for some time.  Kelsey felt "dirty and disgusting."  Appellant

then sat down, told her to come next to him, pulled out his penis, and put it next to her face, indicating he wanted a "blow job." Kelsey complied and put his penis in her mouth. Although she did not want to engage in oral sex, she felt like she had no "other option," and she was not thinking clearly because she was drunk. Throughout the evening she would black out and regain consciousness.

Appellant then kissed Kelsey again and pushed her onto the bed. He said he wanted to have sex and directed her to remove her pants. She said she did not want to and she was a virgin. Appellant said, "No, you're not," and removed her shorts despite her telling him not to. He then got on top of her and put his penis inside her vagina. It hurt, and when she yelled for him to stop, he said he was "almost done." Although she screamed for help, he continued to penetrate her. The rape lasted approximately five minutes. During it, appellant seemed very angry and irritable, and Kelsey was afraid he might hurt her.

When appellant got off of Kelsey she felt "traumatized," "in shock," and "betrayed." She accused him of raping her. He grabbed a cell phone, called her grandparents and told them to pick her up. While he was talking to them, Kelsey was screaming into the phone that appellant had raped her. He then told her to stop crying, get dressed and not tell anyone about what had happened. He said if she told her grandparents (his parents) or the police, he would get in trouble. When she tried to leave, appellant stood in front of the door and pushed her, causing her to fall.

When Kelsey's grandparents arrived, she told them appellant had raped her. They did not believe her. They offered to take her to the hospital, but she asked them to take her to her boyfriend's house. Although she wanted to go to the hospital, she did not trust her grandparents or believe they would take her there. At some point she saw a police car and opened the car door in an attempt to get the officer's attention. Her grandmother tried to restrain her and covered her mouth when the officer approached their car. Kelsey told the officer what had happened and he took her to the hospital.

At about 2:40 a.m. on November 16, 2008, Napa Police Officer Russell Davis saw Kelsey's grandparents' SUV drive erratically and pull over. When Davis approached the SUV, Kelsey's grandfather told Davis Kelsey was intoxicated and out of control, but did not mention her having been possibly raped. Kelsey was crying, "hysterical," yelling that no one believed her, and her grandmother was trying to keep her from talking. Kelsey told Davis she had been raped by her uncle and was in a lot of pain. She appeared to be intoxicated. Davis administered a PAS test at about 2:00 a.m., which revealed Kelsey's blood alcohol level to be .143. He transported her to the hospital. At the hospital Kelsey described the sexual assault to Davis.

4

At the hospital, sexual assault nurse examiner Vickie Whitson performed a sexual assault examination on Kelsey. Kelsey said she had vaginal pain and that appellant had grabbed her arm, pulled her onto the bed and used his body weight to hold her down. She said he put both hands around her neck so tightly she could not speak. Kelsey said she was forced to orally copulate appellant and he penetrated her vagina with his penis. The examination revealed two abrasions of Kelsey's hymen, consistent with blunt force trauma. Whitson opined that sexual abuse was highly suspected. Vaginal swabs from Kelsey tested positive for DNA matching appellant's DNA type.

### Prior Incidents of Domestic Violence and Sexual Abuse

Jaimie M. met and began dating appellant in June 2008. On September 22, 2008, she went to visit him where he was living in Oregon. She ended up staying, and lived with appellant and his three roommates for about two months. On November 2, they argued because appellant took her paychecks and would not give them back. They also argued because he had flirted with a woman whose boyfriend was supposedly moving in with them. Jaimie told appellant she wanted to move back to Napa and he responded by covering her mouth and saying, "What makes you think you're going to get the chance to?" She perceived this as a threat and was afraid. She started screaming, but his hand covered her mouth and no one heard her. They were on the bed and he had his legs over her so she could not move. After about three or four minutes he let her go and said, "'Don't tell anybody.'" She went into the dining room and was talking to roommate Tim Grabner, when appellant called her names and angrily said, "Nobody will know if you're gone." Jaimie feared for her life. She grabbed a knife but Grabner told her, "Don't do that." Appellant then picked her up by the throat, threw her to the ground, choked her with his arm and said, "You're not worth it." Grabner told appellant to stop and pulled him off Jaimie. Jaimie ran outside and another roommate called the police.

Grabner testified he befriended appellant when they were in middle school. In September 2008, they resumed their friendship and began living together when appellant moved to Oregon. Grabner said appellant controlled appellant's relationship with Jaimie. On one occasion, Grabner heard Jaimie's muffled scream from inside appellant and Jaimie's bedroom; there was no response when Grabner and his fiancée knocked on the door. Grabner next saw appellant and Jaimie arguing in the kitchen and appellant would not let her move away from the refrigerator. Jaimie picked up a knife and appellant grabbed it. Appellant then slammed Jaimie against the wall, held her by her throat, threw her over his shoulder and they both fell to the floor. Appellant then began choking her

5

while saying, "The bitch is not worth it, and I'm just going to fucking kill her." Grabner pulled appellant off Jaimie and she ran outside. Appellant later told Grabner he was "not necessarily too concerned about what he had done" to Jaimie. About a month later, appellant joked about the incident with Jaimie after learning that Jaimie's then-boyfriend was in jail, saying, "I don't understand why she dumped me . . . for a fat rapist when she could have at least had a good looking one."

Appellant also told Grabner that Erica was a "slut and whore" and he had "bent [Erica] over, raped and sodomized her," and burned her with a cigarette. He was confident that Erica would never testify against him. Appellant told Grabner that if his brother found out about the sexual incident with Kelsey when appellant and Kelsey were much younger, appellant's brother would kill him.

Krystal W. dated appellant for about six weeks beginning in mid-February 2009. A couple of weeks later she moved in with appellant and his parents. She broke up with him at the end of March because there had been an increasing amount of physical intimidation. Sometimes when playing with her, despite her telling him to let go, appellant would grab and hold her in a way that she "would have difficulty breathing" and she "would be crying." On one occasion while Krystal showed appellant her bedroom at her parents' house, appellant removed his clothes, pushed her onto the bed and began removing her clothes. Although she said she did not want to have sex, he put on a condom, restrained her wrists and vigorously and forcefully started having sexual intercourse with her against her will. He then tried to convince her he had not sexually assaulted her. Thereafter, Krystal was afraid of appellant and "too afraid to leave him."

Krystal described appellant's level of anger as "unhinged"; he would escalate a small issue into something much larger. On one occasion, appellant told Krystal's sister's boyfriend that if Krystal's sister did not want to engage in certain sexual acts, "you should just rape her."

On March 22, 2009, Krystal and appellant argued while in bed. He told her it would be very dangerous for her to stay in the bedroom since he had "been pushed to this wild and violent edge before." At some point, he left the bedroom. When he returned he said he had done some reprehensible actions for which he could not forgive himself. Krystal was afraid of appellant because he was yelling and throwing things. On March 24, she left appellant and ended the relationship. She left Napa County because she was afraid appellant would attempt to find her.

*The Defense*

Charles Gilman Gordon ([Gil] Gordon), appellant's father and Kelsey's grandfather and guardian, testified that on November 16, 2008,

when he picked up Kelsey at the apartment complex, she appeared a "little agitated," said she had been assaulted, and repeatedly asked to be taken to her boyfriend's home. She appeared to have been drinking. [Gil] Gordon did not recall whether she said she was raped.

[Gil] Gordon received letters written by appellant from jail. One letter said that "people need[ed] to lie on the stand." Another letter said, "The only way I'm going to beat Erica in court is if everyone knows about Erica and my S and M in one way or another. Not everyone can have the same story, but everyone needs to be in the same ballpark." [Gil] Gordon said he made no effort to fabricate evidence.

Connie Gordon testified that when she and [Gil] Gordon went to pick Kelsey up at the apartment complex Kelsey was intoxicated. After Connie Gordon told Kelsey she would not take her to her boyfriend's house, Kelsey said she was sexually assaulted and raped. Connie Gordon denied holding her hand over Kelsey's mouth. She also said Kelsey had a very bad reputation in the family for truthfulness in the six months leading to November 15, 2008. Connie Gordon testified that a psychologist had said that Kelsey lies to get attention. She also said she did not believe appellant raped and burned Erica.

Appellant testified he and Erica engaged in anal and vaginal penetration. They both used methamphetamine and alcohol. They engaged in "rough sex" and sadomasochistic sex.

Appellant described the events regarding the January 2008 charged incident involving Erica. That morning, before he went to work, he and Erica had "passionate" sex without "the roughness and fantasies and the dirty talk." When he returned home that night, the apartment smelled like methamphetamine and it appeared that Erica had had sex with someone else that day. Appellant felt "disillusioned" because Erica was apparently not sexually satisfied by him. After Marlene left, he and Erica entered the bedroom and had sex. Appellant denied slapping or hitting Erica before entering the bedroom. They had rough sex but when he attempted to perform anal sex, Erica "wasn't ready for it," and began angrily yelling at him. Appellant got angry, lit a cigarette and as they argued, put the cigarette out on her thigh. He denied ever calling her a whore. Erica began to cry and appellant immediately tried to put ice on her cigarette burn. Their sexual relationship ended, but they continued living together until February 14 when Erica moved away.

Appellant denied choking Jaimie when they lived together in Oregon. He said they argued and she attacked him with a piece of metal and then a knife. In self-defense, he grabbed her hand and she dropped the knife. Appellant denied telling Grabner that he raped or sodomized Erica. He did tell Grabner he had burned Erica with a cigarette and exposed his penis to a four-year-old when he was 11 years old. Appellant

said he had consensual sex with Krystal and never raped her, threatened her, or forced her to have sex.

Appellant testified that on November 15, 2008, he and Kelsey made plans to get together that evening. She showed up at the apartment complex, sat on his lap and persistently asked him to give her alcohol. He refused because she had been drinking malt liquor and he did not want her to vomit after mixing malt liquor and other alcohol. They then began kissing and she offered to perform oral sex if he gave her alcohol. He agreed. They then resumed kissing and had consensual sex. She then asked him for the alcohol and he complied and went for a walk. When he returned to the apartment they both drank. Eventually, he took the bottle away from her and she went to the bathroom and vomited and asked him to call her boyfriend Dylan. Appellant called him, but Dylan did not have a car. Appellant protested that it was too late when Kelsey said she would walk to Dylan's house. When he prevented her from leaving and threatened to call his parents (her grandparents), Kelsey said she would tell them he raped her. Appellant then called her grandparents, who came and got Kelsey.

Appellant admitted repeatedly lying to Detective Elia for "tactical reasons." He also admitted asking family and friends to assist him in fabricating a defense.

Dkt. 21 ("Answer"), Ex. C at 2–10 (<u>People v. Gordon</u>, No. A126961, 2010 WL 3771284 (Cal. Ct. App. Sep. 29, 2010)). This factual summary by the state court of appeal of the evidence presented at trial is presumed correct, and Gordon does not raise a dispute over the presumptive correctness of this summary. <u>See</u> 28 U.S.C. § 2254(e)(1). The traverse discloses that Gordon is a transgender woman and is currently undergoing a male-to-female medical transition. Dkt. 33. The court herein refers to Gordon by her preferred pronouns but notes for clarity that the state court record contains references to Gordon as male.

## II. Procedural History

### A. State Court Trial and Direct Appeal

On October 2, 2009, following a bench trial in the Napa County Superior Court, Gordon was convicted of two counts of rape under California Penal Code § 261(a)(2) (Counts 1 and 3); oral copulation with a minor under § 288a(b)(1) (Count 2); sodomy by force under § 286(c) (Count 4); and infliction of corporal injury on a cohabitant under

8

§ 273.5(a)(5) (Count 5).

Additionally, the court found true a multiple victim allegation under California Penal Code § 667.61(b) as to the rape counts. On November 4, 2009, the trial court sentenced Gordon to an indeterminate term of forty-nine years and eight months to life in prison with the possibility of parole.

On November 30, 2009, Gordon appealed to the court of appeal, which affirmed her conviction on September 29, 2010. Answer, Ex. C. The California Supreme Court denied review on December 15, 2010. Answer, Ex. E (People v. Gordon, No. S187212 (Cal. Dec. 15, 2010)).

### B. State Court Habeas Proceedings

On November 22, 2011, Gordon filed a habeas petition with the Napa County Superior Court, which dismissed the petition as untimely on December 5, 2011. On January 3, 2012, Gordon filed a habeas petition with the California Court of Appeal. On January 17, 2012, the California Court of Appeal denied the petition without prejudice. The state appellate court noted that Gordon raised new arguments regarding the timeliness of her habeas petition that were not previously presented to the Napa County Superior Court, and as a result, ruled that Gordon had not exhausted her habeas remedy with the Superior Court. In accordance with that order, on January 20, 2012, Gordon filed an amended habeas petition with the Napa County Superior Court. On February 7, 2012, the superior court requested informal briefing from the parties. On April 24, 2012, after considering the informal response to the amended state habeas petition and Gordon's reply thereto, the superior court ordered respondent to show cause why the petition should not be granted, requesting a full analysis of the merits of the claims.

On June 5, 2013, the Napa County Superior Court issued a tentative ruling on the 35 claims in Gordon's state habeas petition. See Pet. (dkt. 16), Ex. 60 (In re Gordon, No. HC 1605 (Napa Super. Ct., June 6, 2013)). Gordon filed objections to the state court's tentative findings on the habeas petition. Pet., Ex. 61. After considering the parties' submissions regarding the tentative findings, the superior court ordered an evidentiary

hearing on four factual issues related to Gordon's April 1, 2009, interview, and adopted its tentative findings in all other respects as final. Pet., Ex. 62. With respect to claim 1 (violation of Massiah v. United States, 377 U.S. 201 (1964)), the state court found that Gordon's Massiah rights did not attach at the time of her April 1, 2009 interrogation because adversarial judicial proceedings had not commenced. Pet., Ex. 60 at 3–6. With respect to Gordon's Miranda claim (claim 2), the state court found that an evidentiary hearing was necessary to determine whether Gordon's Miranda waiver was valid, as she claimed to have been intoxicated at the time and/or coerced by the interrogator, Detective Elia. Id. at 7. The state court found that "no reasonable likelihood exists that [Gordon] was entitled to relief" on any of the other 33 claims, except to the extent that a few claims (such as ineffective assistance of counsel for failure to raise the Miranda issue) were derivative of claim 2. Id. at 8–32.

The superior court held a discovery hearing in the state habeas proceedings on December 17, 2013. Pet., Ex. 63. On January 6 and 7, 2014, the superior court held an evidentiary hearing to address: (1) whether Gordon was intoxicated during the April 1, 2009, interview; (2) whether Gordon asserted her Miranda rights on the drive to the police department on April 1, 2009; (3) whether counsel was ineffective for failing to assert a Miranda violation; and (4) whether Gordon was "coerced" by Detective Elia during the April 1, 2009, interview. Pet., Ex. 64 at 7. The superior court held another hearing on April 18, 2014, for argument and ruling on evidentiary issues and the remaining habeas claims. Pet., Ex. 75. On July 15, 2014, the superior court issued written findings that Gordon "was not intoxicated during his April 1, 2009 interview," and that Det. Elia did not "coerce" Gordon into waiving her Miranda rights. Pet., Ex. 76 at 1 (In re Gordon, No. HC 1605 (Napa Super. Ct. July 15, 2014)). The superior court also rejected Gordon's 36th claim—added by amendment on January 6, 2014, and corresponding to claim 17 in the instant petition—for violations of Brady v. Maryland, 373 U.S. 83 (1963). Id. In all other respects, the superior court affirmed its tentative ruling and denied the habeas petition in its entirety. Id. at 2.

Gordon filed a petition for writ of habeas corpus in the court of appeal, which denied the petition on June 24, 2015. Pet., Ex. 77 (In re Gordon, No. A142558 (Cal. Ct. App. June 24, 2015)). Gordon filed an untimely petition for review and an application for relief from default to file an untimely petition for review, which the California Supreme Court denied on July 24, 2015. Answer, Suppl. Ex. K-87 (Letter/Order re: Appl. for Relief from Default, Cal. Supreme Court Case No. S228004).

On July 28, 2015, Gordon filed a new petition for writ of habeas corpus in the California Supreme Court, which denied the petition on the merits with respect to the claims of ineffective assistance of trial counsel and appellate counsel. Pet., Ex. 79; Answer, Ex. I (In re Gordon, No. S228110 (Cal. Nov. 10, 2015)).

## C. Federal Habeas Proceedings

On February 16, 2012, while Gordon's habeas petition was pending in state court, she filed a federal habeas petition raising thirty-eight claims for relief. Dkt. 1. On March 28, 2012, this court stayed the matter to allow Gordon to exhaust her claims in state court. Dkt. 6.

The court lifted its stay of the instant case on December 10, 2015. Dkt. 10. Gordon filed her first amended habeas petition the next day. Dkt. 11. In light of errors in the first amended petition, the court granted leave to file a second amended petition on May 2, 2016. Gordon filed the second amended petition on May 14, 2016. Dkt. 16. By order entered November 21, 2016, the court dismissed claims 5, 6, 8, 10, and 18, and dismissed claim 14 in part with respect to the alleged sentencing error under state law, for failing to state a cognizable ground for federal habeas relief. The court ordered respondent to show cause with respect to the remaining claims:

> **Claim 1**: Gordon's pretrial statements—her April 1, 2009, interrogation, the December 17, 2008, pretext phone call with Doe No. 2, and her communications on MySpace elicited by Detective Elia—were elicited and introduced in violation of her right to counsel under Massiah v. United States, 377 U.S. 201 (1964).

**Claim 2**: The statements from Gordon's April 1, 2009, interrogation were elicited and introduced in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), because Gordon did not waive her <u>Miranda</u> rights, the waiver was coerced, and/or because Gordon was intoxicated at the time of the interrogation.

**Claim 3**: Gordon's pretrial statements were inadmissible as the product of "outrageous government conduct" amounting to a due process violation.

**Claim 4**: Trial counsel was ineffective in not objecting to the introduction of Gordon's pretrial statements into evidence on the grounds identified in claims 1–3.

**Claim 7**: Trial counsel was ineffective for not objecting to the trial court's exclusion of evidence impeaching Doe No. 1 and Doe No. 2, as described in claims 5–6, on "all available grounds," including Gordon's right to confrontation.

**Claim 9**: Gordon's "jailhouse letters" were improperly admitted into evidence at trial because they were written "involuntarily" in light of her incarceration in a segregation unit, her suicidal state of mind, and the antidepressant medications she was taking at the time, in violation of the Fifth Amendment.

**Claim 11**: Trial counsel was ineffective in failing to conduct an adequate factual and legal investigation to prepare Gordon's case for trial.

**Claim 12**: Trial counsel was ineffective in failing to litigate material issues during the pretrial and in limine proceedings.

**Claim 13**: Trial counsel was ineffective in failing to adequately present Gordon's defense of reasonable but mistaken consent on Counts I, III, and IV.

**Claim 14** (in part): The 49-years-to-life sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment.

**Claim 15**: Trial counsel was ineffective for not objecting to the sentence on the grounds identified in claim 14.

**Claim 16**: Appellate counsel was ineffective in failing to raise the issues identified in claims 8 and 14 on appeal.

**Claim 17**: Five pieces of exculpatory evidence discovered in post-conviction proceedings should have been disclosed to trial counsel under Brady v. Maryland, 373 U.S. 83 (1963).

**Claim 19**: The admission into evidence of Gordon's uncharged prior acts of sexual assault and domestic violence under Cal. Evid. Code §§ 1108, 1109, and 1101(b) violated due process and Gordon's right to a fair trial.

**Claim 20**: "Cumulative error" as a result of the errors described in claims 1–19 amounts to a denial of due process.

See dkt. 18 at 6–7.

Respondent filed an answer to the second amended petition on March 21, 2017. Dkt. 21 ("Answer"). Gordon timely filed the traverse on January 12, 2018. Dkt. 33 ("Traverse"). Respondent filed objections to new exhibits filed with the traverse and responded to new arguments raised in the traverse. Dkt. 40. On January 30, 2018, Gordon filed a request for an evidentiary hearing to which respondent filed an opposition, followed by Gordon's reply. Dkts. 38, 41, 47.

On August 17, 2018, the court held that Exhibits 80 to 83, which were newly submitted with the traverse, were offered to provide evidence of Gordon's gender dysphoria in support of Claims 2, 9, 12, and 14, and that this evidentiary basis in support of those claims was not fully and fairly presented to the state court. Dkt. 55. The court directed Gordon to address any applicable grounds to request a stay and abeyance of the mixed habeas petition to exhaust those claims. After filing a second habeas petition in the California Supreme Court to present the unexhausted claims and exhibits, Gordon filed a motion to stay and hold the federal habeas petition in abeyance, which the court granted on October 16, 2018. Dkt. 61.

1    After briefing was submitted, the California Supreme Court denied Gordon's

2    second habeas petition with a citation to In re Miller, 17 Cal. 2d 734, 735 (1941).  In re

3    Gordon, No. S251581 (Cal. Mar. 27, 2019).  After Gordon filed a notice of the state

4    court's ruling on the exhaustion petition, the court reopened the federal habeas

5    proceedings and ordered additional briefing limited to the issues raised in the traverse by

6    the evidence of Gordon's gender dysphoria diagnosis and treatment in support of claims

7    2, 9, 12 and 14.  Dkt. 65.  Respondent filed a supplemental answer on May 24, 2019.

8    Dkt. 66 ("Suppl. Answer").  Gordon filed a supplemental traverse on September 20, 2019,

9    and respondent filed a reply to the opposition to procedural default on September 26,

10   2019.  Dkts. 72 ("Suppl. Traverse"), 73 ("Suppl. Reply to Procedural Default Opp.").

11   Gordon filed a supplemental request for an evidentiary hearing, which was followed by an

12   opposition and reply.  Dkts. 74, 75, 78.

13   Gordon's habeas petition and requests for evidentiary hearing are now fully

14   briefed, and the court determines that the matter is suitable for decision without oral

15   argument.

16   **STANDARD OF REVIEW**

17   Under The Antiterrorist and Effective Death Penalty Act of 1996 ("AEDPA"),

18   applicable to any federal habeas petition filed after April 1, 1996, a district court may not

19   grant a petition challenging a state conviction or sentence on the basis of a claim that

20   was reviewed on the merits in state court unless the state court's adjudication of the

21   claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

22   application of, clearly established Federal law, as determined by the Supreme Court of

23   the United States; or (2) resulted in a decision that was based on an unreasonable

24   determination of the facts in light of the evidence presented in the State court

25   proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to

26   mixed questions of law and fact, Williams (Terry) v. Taylor, 529 U.S. 362, 407–09,

27   (2000), while the second prong applies to decisions based on factual determinations,

28   Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

1    A state court decision is "contrary to" Supreme Court authority, that is, falls under

2  the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to

3  that reached by [the Supreme] Court on a question of law or if the state court decides a

4  case differently than [the Supreme] Court has on a set of materially indistinguishable

5  facts." Williams (Terry), 529 U.S. at 412–13.  A state court decision is an "unreasonable

6  application of" Supreme Court authority, falling under the second clause of § 2254(d)(1),

7  if it correctly identifies the governing legal principle from the Supreme Court's decisions

8  but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

9  The federal court on habeas review may not issue the writ "simply because that court

10  concludes in its independent judgment that the relevant state-court decision applied

11  clearly established federal law erroneously or incorrectly." Id. at 411.  Rather, the

12  application must be "objectively unreasonable" to support granting the writ. Id. at 409.

13    A state court's determination that a claim lacks merit precludes federal habeas

14  relief so long as "fairminded jurists could disagree" on the correctness of the state court's

15  decision. Harrington v. Richter, 562 U.S. 86, 101 (2011) (citing Yarborough v. Alvarado,

16  541 U.S. 652, 664 (2004)).  "Evaluating whether a rule application is unreasonable

17  requires considering the rule's specificity.  The more general the rule, the more leeway

18  courts have in reaching outcomes in case-by-case determinations." Id.  "As a condition

19  for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that

20  the state court's ruling on the claim being presented in federal court was so lacking in

21  justification that there was an error well understood and comprehended in existing law

22  beyond any possibility for fairminded disagreement." Id. at 103.

23    Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

24  determination will not be overturned on factual grounds unless objectively unreasonable

25  in light of the evidence presented in the state-court proceeding." Miller-El, 537 U.S. at

26  340.  Review under § 2254(d)(1) is limited to the record that was before the state court

27  that adjudicated the claim on the merits. Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

28

**DISCUSSION**

**I.    Procedural Default**

As an initial matter, respondent argues that Claims 1 (<u>Massiah</u> violation), 2 (<u>Miranda</u> violation), 3 (outrageous government conduct) and 9 (jailhouse letters) were denied by the court of appeal and state supreme court on procedural grounds and are procedurally defaulted.  Answer at 9; Suppl. Answer at 2–4.  A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 729–30 (1991).

Respondent points out that the court of appeal denied the state habeas claims corresponding to Claims 1, 2, 3 and 9 of the operative federal habeas petition for failure to demonstrate that the claims were timely, failure to raise the claims on direct appeal, and failure to preserve the claims at trial under the contemporaneous objection rule. Pet., Ex. 77 (citing, inter alia, <u>In re Clark</u>, 5 Cal. 4th 750 (1993) and <u>In re Robbins</u>, 18 Cal. 4th 770 (1998)).  The California Supreme Court silently adopted those procedural bars with respect to those claims.  Pet., Ex. 79.

With respect to Claims 2 and 9, which were supplemented by new evidence and argument reflecting Gordon's gender dysphoria, those supplemented claims were presented in Gordon's second habeas petition to the California Supreme Court, which issued a postcard denial citing <u>In re Miller</u>, 17 Cal. 2d 734, 735 (1941) (per curiam). Suppl. Answer, Ex. Q.  As the Ninth Circuit has recognized, the state court's citation of <u>In re Miller</u> in denying a second habeas petition "signals that the Court is denying the petition for the same reasons that it denied the previous one."  <u>Kim v. Villalobos</u>, 799 F.2d 1317, 1319 n.1 (9th Cir. 1986).  Applying <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 804 n.3 (1991), the court looks through the California Supreme Court's denial of the second habeas petition to the last reasoned state court opinion, namely, the court of appeal's June 24, 2015, decision, as the state court's basis for denying the claims presented in the exhaustion petition.  That is, the state court denied Claims 2 and 9, as supplemented in

16

1   the second state habeas petition, on the grounds of untimeliness, failure to raise the

2   claims on direct appeal under In re Dixon, 41 Cal. 2d 756, 759 (1953), and the

3   contemporaneous objection rule.

4         As Gordon concedes, California's timeliness rule against substantial delay in filing

5   habeas claims, as reflected in Clark and Robbins, is both independent and adequate.

6   Traverse at 17 (citing Walker v. Martin, 562 U.S. 307 (2011)).  However, Gordon asserts

7   that application of the timeliness bar was specifically inadequate in her case, reasoning

8   that the court of appeal's June 24, 2015, denial of the initial state habeas petition as

9   untimely pre-dated the new evidence submitted in the second-filed exhaustion petition

10  filed on September 26, 2018, such that California Supreme Court would have needed to

11  impose a new finding of untimeliness as to the new evidence related to her gender

12  dysphoria diagnosis.  Suppl. Traverse at 3–4.  In the order denying the second-filed

13  habeas petition, Suppl. Answer, Ex. Q, the California Supreme Court's citation to In re

14  Miller for the principle that "courts will not entertain habeas corpus claims that are

15  repetitive," indicates that the state court denied the supplemented claims of the second

16  habeas petition because it presented the same grounds set forth in a prior petition,

17  without disclosing "'a change in the facts or the law substantially affecting the rights of the

18  petitioner.'"  Karis v. Vasquez, 828 F. Supp. 1449, 1457 (E.D. Cal. 1993) (quoting In re

19  Miller, 17 Cal. 2d at 735).  Under Ylst, this court presumes that the state supreme court

20  denied the supplemented claims presented in Gordon's second habeas petition under the

21  same procedural bars that were applied in the last reasoned decision to deny state

22  habeas relief on those claims, including the timeliness bar.  501 U.S. at 804 n.3.  Gordon

23  fails to show that the state court's denial of supplemented Claims 2 and 9 as untimely

24  imposed "novel and unforeseeable requirements without fair or substantial support in

25  prior state law."  Martin, 562 U.S. at 320–21 (finding "no basis for concluding that

26  California's timeliness rule operates to the particular disadvantage of petitioners asserting

27  federal rights") (citation and internal marks omitted).

28

United States District Court
Northern District of California

1    Because the court finds that Claims 1, 2, 3, and 9 were procedurally defaulted on

2    the separate and independent ground of untimeliness, the court need not reach Gordon's

3    arguments challenging the separate procedural bars under the <u>Dixon</u> rule or the

4    contemporaneous objection rule.  Traverse at 8–14, 14–17; Suppl. Traverse at 2–4.

5    In the alternative, Gordon argues that the procedural default is excused by cause

6    for the default and actual prejudice as a result of the alleged violation of federal law.  <u>See</u>

7    <u>Coleman</u>, 501 U.S at 750.  Because Gordon alleges that the failure to timely preserve

8    Claims 1, 2, 3 and 9 was caused by ineffective assistance of trial counsel, a

9    determination of whether attorney error qualifies as "cause" to excuse procedural default

10   would require determination whether there was ineffective assistance of counsel.  <u>See</u>

11   <u>Davila v. Davis</u>, 137 S. Ct. 2058, 2062 (2017) ("An attorney error does not qualify as

12   'cause' to excuse a procedural default unless the error amounted to constitutionally

13   ineffective assistance of counsel."); <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986).  In the

14   interest of judicial efficiency, the court considers the merits of those claims to determine

15   whether the alleged ineffective assistance of counsel in failing to preserve those claims

16   resulted in actual prejudice, without setting forth a separate cause and prejudice analysis

17   on the procedural default question.  <u>See</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 296 (1999)

18   (requiring a reasonable probability that the conviction or sentence would have been

19   different to establish prejudice to overcome procedural default).  Having considered the

20   merits of Claims 1, 2, 3, and 9 on de novo review, <u>infra</u>, the court finds no "reasonable

21   probability" that the outcome of the trial would have been different had those claims been

22   preserved, and determines that the alleged ineffective assistance of counsel did not

23   result in prejudice to excuse the procedural default of those claims.  <u>See</u> <u>Visciotti v.</u>

24   <u>Martel</u>, 862 F.3d 749, 769 (9th Cir. 2016) (applying de novo standard of review to

25   ineffective assistance of counsel claims in the cause-and-prejudice context), <u>cert. denied</u>,

26   138 S. Ct. 1546 (2018).  Accordingly, Claims 1, 2, 3, and 9 are DISMISSED as

27   procedurally defaulted.  As discussed below, the court further denies Claims 1, 2, 3, and

28   9 on the merits, as a separate ground from procedural default for denying habeas relief.

**II.    Claims Based on Statements Made During Investigation**

    **A.    Claim 1: <u>Massiah</u> Claim**

    In Claim 1, Gordon asserts that the police officers investigating the November 15, 2008, rape of Doe No. 1 deliberately elicited incriminating statements without the presence of counsel in violation of <u>Massiah v. United States</u>, 377 U.S. 201 (1964). Gordon challenges the elicitation of statements that she made during a pretext phone call with Doe No. 2 on December 17, 2008; statements made on MySpace to the accounts of Doe No. 1 and Jaimie M. between December 2008 and March 2009; and statements made during an interview at the Napa Police Department with Detective Elia on April 1, 2009.  Pet. at 13–19.

    The record reflects that the Napa County Superior Court considered and denied Claim 1 on the merits after conducting an evidentiary hearing on factual issues related to the April 1, 2009, interview.  Pet., Ex. 60, 62, 76.  However, the court of appeal denied Claim 1 on procedural grounds and did not rule on the merits of this claim as a separate and alternative ground for denial.  Pet., Ex. 77.  Respondent concedes that the California Supreme Court silently adopted the procedural bars with respect to Claim 1 and all claims presented in the state habeas petition that were denied on procedural grounds by the court of appeal, other than the ineffective assistance of counsel claims which the state supreme court denied on the merits.  Dkt. 40 at 5.  Because the state court denied Claim 1 on procedural grounds, the state court's denial of this claim is not subject to AEDPA's deferential standard on federal habeas review; instead, the claim is reviewed de novo.  <u>Cone v. Bell</u> ("Cone II"), 556 U.S. 449, 472 (2009); <u>James v. Ryan</u>, 733 F.3d 911, 914 (9th Cir. 2013).  "Nonetheless, under AEDPA, factual determinations by the state court are presumed correct and can be rebutted only by clear and convincing evidence."  <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1168 (9th Cir. 2002) (citing 28 U.S.C. § 2254(e); <u>Appel v. Horn</u>, 250 F.3d 203, 210 (3d Cir. 2001)).

    In support of Claim 1, Gordon alleges that she was represented by attorney Mervin Lernhart in prior probation revocation proceedings in August 11, 2008.  Gordon indicates

United States District Court
Northern District of California

that after Detective Elia contacted her by telephone on November 17, 2008, she retained Lernhart as counsel regarding the allegations that she raped Doe No. 1. Pet. at 13 and Exs. 27, 37, 38, 44, 45. On November 18, 2008, Gordon met with attorney Lernhart and self-surrendered before the Napa County Superior Court to "return/surrender on warrant" issued August 11, 2008, for a probation violation. Pet. at 13 and Ex. 13 (Aug. 7, 2008 Petition to Revoke Probation, Aug. 11, 2008 Bench Warrant, and Minute Orders dated Nov. 18, 2008 to Apr. 6, 2009). The superior court ordered Gordon remanded into custody on November 18, 2008, and continued the probation violation matter to November 25, 2008. Gordon alleges that Detective Elia arrested her at the Napa Detention Center, pursuant to the "Arrest/Detention/Complaint" form signed by Detective Elia on November 18, 2008, which described "PROBABLE CAUSE FOR ARREST\DETENTION" based on the alleged rape of Doe No. 1. Pet. at 14 and Exs. 8 (Incident/Investigation Report and Supplemental Reports) and 14 (Arrest/Detention/ Complaint) (also submitted as Clerk's Transcript ("CT") at 1). On November 19, 2008, a superior court judge determined there was probable cause to detain Gordon and set bail at $250,000. Traverse at 25 and Ex. 14. Gordon argues that at this point, she had been formally accused of committing a felony, thereby triggering her right to counsel under Massiah. Traverse at 25.

In Massiah, the Supreme Court held that once a criminal defendant has been indicted and the right to counsel attaches, the government may not deliberately elicit statements from the accused in the absence of counsel. 377 U.S. at 205–07. Under well-settled Supreme Court authority, "the clear rule of Massiah is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." Brewer v. Williams, 430 U.S. 387, 401 (1977). The Sixth Amendment right of the accused to assistance of counsel "does not attach until a prosecution is commenced," which, for purposes of the right to counsel, is at "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Rothgery v.

Gillespie Cty., Tex., 554 U.S. 191, 198 (2008) (citations and internal marks omitted). See United States v. Percy, 250 F.3d 720, 725 (9th Cir. 2001) ("This Circuit adheres to the bright-line rule that the Sixth Amendment's right to counsel attaches upon the initiation of formal charges.") (citing United States v. Hayes, 231 F.3d 663, 675 (9th Cir. 2000) (en banc)).

In its findings on Gordon's Massiah claim, the superior court found that the November 19, 2008, judicial determination of probable cause to detain Gordon after her arrest was a non-adversarial, preliminary determination based on a police declaration, similar to a pre-arrest probable cause determination for an arrest warrant. Pet., Ex. 60 at 6 (citing County of Riverside v. McLaughlin, 500 U.S. 44 (1991) (requiring judicial determination of probable cause within 48 hours of arrest); Jones v. City of Santa Monica, 382 F.3d 1052 (9th Cir. 2004) (post-arrest probable cause determination may be informal and non-adversarial)). The superior court found that charges against Gordon "were not filed until April 1, 2009, and Petitioner was not arraigned until the following day." Id. These factual determinations are presumed correct and Gordon does not rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Accordingly, the court determines as a matter of law that Gordon's arrest on November 18, 2008, and the state court's probable cause determination on November 19, 2008, did not initiate actual criminal charges or formal adversarial proceedings to trigger the right to counsel under Massiah.

As the record reflects, Gordon admitted to the probation violation, was sentenced to 21 days in jail with credit for time served, and released from custody on December 9, 2008, but was not charged with the sex offenses at issue until April 1, 2009. Pet., Ex. 13. Gordon argues that she was aware of the rape charges when she self-surrendered, and that her right to counsel attached at the time of her arrest on November 18, 2008, and the subsequent probable cause finding on November 19, 2008, because the proceedings had transitioned from merely investigative to adversarial. Traverse at 26. Gordon does not assert that she was arraigned or formally charged with Doe No. 1's rape before April

1, 2009, and she offers no authority for the proposition that being aware of a criminal investigation at the time of arrest triggers the right to counsel under Massiah. It is well-settled under Supreme Court authority that "the right to counsel does not attach until the initiation of adversary judicial proceedings" and "we have never held that the right to counsel attaches at the time of arrest." United States v. Gouveia, 467 U.S. 180, 188, 190 (1984). Accordingly, Claim 1 is DENIED.

### B.    Claim 2: Miranda Claim

In Claim 2, Gordon asserts that her statements to Detective Elia during a recorded interrogation at the Napa Police Department on April 1, 2009, were admitted at trial in violation of Miranda because her waiver of Miranda rights was neither voluntary nor knowing and intelligent. Gordon asserts that she was intoxicated at the time of the interrogation, such that her waiver was not knowingly and intelligently made.

Gordon further argues that Detective Elia coerced her into talking by arresting her at a probation meeting, denying her requests to make a telephone call, seeking her waiver in exchange for removing her handcuffs after she complained of pain due to poison oak on her wrists, telling her to speak or she was going to jail, suggesting that the interrogation would be the only chance for her to tell her side of the story, promising that she would be given a cigarette after the interview, calling her prior invocation of her right to counsel a "moot point," and suggesting that her lawyer would not let her testify. Pet. at 19–29. Gordon also argues that her untreated gender dysphoria contributed to her alcohol and drug dependence. Traverse at 32–33 and Ex. 80.[1]

Because the state court denied this claim on procedural grounds, Pet., Ex. 77, the court conducts de novo review of questions of law and mixed questions of law and fact. See James, 733 F.3d at 914. The factual determinations of the state court are presumed correct under § 2254(e)(1).

---

[1]    Because Gordon has exhausted the exhibits and arguments related to her gender dysphoria in state court, respondent's objections to Exhibits 80-83 as unexhausted are DENIED as moot. Dkt. 40 at 3.

### 1.     Legal Standard

Miranda requires that a person subjected to custodial interrogation be advised that "he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." Miranda v. Arizona, 384 U.S. 436, 444 (1966).  The warnings must precede any custodial interrogation, which occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action.  Id.  Once properly advised of his rights, an accused may waive them voluntarily, knowingly and intelligently.  See Miranda, 384 U.S. at 475.  The distinction between a claim that a Miranda waiver was not voluntary, and a claim that such waiver was not knowing and intelligent is important.  Cox v. Del Papa, 542 F.3d 669, 675 (9th Cir. 2008). The voluntariness component turns on the absence of police overreaching, i.e., external factors, whereas the cognitive component depends upon the defendant's mental capacity.  Id.  Although courts often merge the two-pronged analysis, the components should not be conflated.  Id.

### 2.     Knowing and Intelligent Waiver

In the state court habeas proceedings, the superior court held an evidentiary hearing on January 6 and 7, 2014, on the factual issues whether Gordon was intoxicated during the April 1, 2009, interview and whether she was coerced by Detective Elia during the interview, with Gordon having withdrawn the issue whether she asserted her Miranda rights on the drive to the police station.  Pet., Ex. 64 at 8–9.  Gordon contends that her Miranda waiver, as recorded in the videotaped interview with Detective Elia, was not knowing and intelligent because, due to her intoxication, she was not fully aware of "the nature of the right being abandoned and the consequences of the decision to abandon it." Traverse at 37 (citing Moran v. Burbine, 475 U.S. 412, 421 (1986)).  See Pet., Ex. 72 at 4 (transcript of recorded interview).  At the evidentiary hearing, the superior court heard live testimony addressing Gordon's condition by the arresting officers, Mike Walund and Brian Campagna, and the investigating detective Darlene Elia who conducted the

1  interview, and watched the video recording of the April 1, 2009, interview.  Pet., Ex. 65 at

2  70–77 (Walund); 88, 94–100 (Campagna); 237 (playing DVD of interview); 287–94 (Elia).

3      At a hearing on April 18, 2014, the superior court announced its findings that

4  Gordon was not under the influence of alcohol during the April 1, 2009, interview "to the

5  extent that he was not aware of his surroundings, didn't know what he was saying, and

6  didn't understand what was being said."  Pet., Ex. 65 at 31.  This factual determination by

7  the state court is presumed to be correct and Gordon fails to rebut the presumption by

8  clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  While Gordon asserts that her

9  gender identity issues, combined with other factors in her upbringing, contributed to

10  alcohol and drugs as a form of self-medication, Traverse, Ex. 80, the evidence linking

11  Gordon's gender dysphoria in adolescence and adulthood with her history of substance

12  abuse is not relevant to the factual question whether she was under the influence at the

13  time of waiving her <u>Miranda</u> rights.  Presuming the correctness of the state court's finding

14  that Gordon was not intoxicated, and having independently reviewed the video recording

15  of the April 1, 2009, interview, the court determines that Gordon was not incapacitated

16  when she waived her <u>Miranda</u> rights, and that her waiver was knowing and intelligent.

17  <u>See</u> <u>Medeiros v. Shimoda</u>, 889 F.2d 819, 823 (9th Cir. 1989).

18      Gordon's argument that the state court violated her right to due process at the

19  evidentiary hearing by denying her request to take judicial notice of a DMV handbook and

20  other hearsay evidence to establish her level of intoxication, fails to show prejudice and

21  lacks merit in light of the record showing that the state court considered evidence of

22  Gordon's alcohol consumption and heard witness testimony addressing whether she was

23  under the influence at the time of the interview.

24          **3.      Voluntary Waiver**

25      Gordon also argues that under the totality of the circumstances, her <u>Miranda</u>

26  waiver was involuntary due to Detective Elia's coercive techniques such as misleading

27  Gordon about telling her side of the story, forcing her to suffer through tobacco

28  withdrawal, and asking Gordon to waive her <u>Miranda</u> rights after she asked for smoking a

1   cigarette and removing the handcuffs.  Pet., Ex. 72 at 3–4 ("I'd be more comfortable to

2   talk to you if I had a cigarette and if I had … the cuffs off, but I'm willing to settle with the

3   cuffs off.").  Gordon further supports this claim by arguing that suffering from gender

4   dysphoria further exacerbated the psychological problems she experienced, including

5   alcohol and drug dependence.  Traverse at 32–33.

6       Under clearly established Supreme Court authority, "[t]he sole concern of the Fifth

7   Amendment, on which Miranda was based, is governmental coercion."  Colorado v.

8   Connelly, 479 U.S. 157, 170 (1986) (citing United States v. Washington, 431 U.S. 181,

9   187 (1977)).  Though a defendant's mental condition may be "relevant to an individual's

10  susceptibility to police coercion," id. at 165, "this fact does not justify a conclusion that a

11  defendant's mental condition, by itself and apart from its relation to official coercion,

12  should ever dispose of the inquiry into constitutional 'voluntariness.'"  Id. at 164 (citing

13  Spano v. New York, 360 U.S. 315 (1959)).  Without coercive police activity, such as

14  lengthy questioning, deprivation of food or sleep, or physical threats of harm, a suspect's

15  mental condition does not render a coherent, alert and responsive detainee's statements

16  involuntary.  United States v. Kelley, 953 F.2d 562, 565 (9th Cir. 1992) (citing Connelly,

17  479 U.S. at 164 n.1), disapproved on other grounds by United States v. Kim, 105 F.3d

18  1579, 1581 (9th Cir. 1997).  In Kelley, the court held that post-arrest statements made by

19  defendant were voluntary, despite physical signs of heroin withdrawal, where he

20  remained coherent, responsive, and aware.  There, the defendant was handcuffed during

21  the interrogation but was never threatened with physical harm if he failed to make a

22  statement; the interrogation lasted one hour and 20 minutes which the court determined

23  was not unduly protracted; and although the interrogation continued for approximately 30

24  minutes after the defendant began to exhibit physical signs of heroin withdrawal, he

25  remained coherent and oriented throughout this time.  Kelley, 953 F.2d at 565.  The court

26  considered that even the fact that the defendant was told that his cooperation would be

27  communicated to the prosecutor and judge did not rise to the level of psychological

28  coercion.  Id.  Under those circumstances, the court in Kelley determined that continuing

the interrogation was not unduly coercive.  Id.

Similarly, Gordon's arguments that Detective Elia coerced her statement by delaying removal of her handcuffs and suggesting that she would go to jail if she did not give a statement do not amount to coercion.  See United States v. Bautista-Avila, 6 F.3d 1360, 1364 (9th Cir. 1993) ("'an interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect'") (quoting United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988)).  In light of these authorities, the court determines that Detective Elia's interrogation techniques do not rise to a level of coercion so offensive that it would render Gordon's Miranda waiver involuntary.  "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."  Connelly, 479 U.S. at 167.

Accordingly, Claim 2 is DENIED.

## C.    Claim 3: Outrageous Conduct

In Claim 3 Gordon argues that her statements made in the pretext telephone call with Doe No 2, on MySpace, and during the April 1, 2009, interview were obtained by government conduct "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."  Pet. at 31 (citing United States v. Russell, 411 U.S. 423, 432 (1973) (reserving the outrageous conduct question)).  She contends that Detective Elia engaged in outrageous investigatory conduct by obtaining her pretrial statements in violation of her Massiah and Miranda rights and by leveraging Gordon's desire to speak to Doe No. 2 and the mother of her aborted child.  Pet. at 29–31.

This claim is subject to de novo review.  As discussed above with respect to Claims 1 and 2, Gordon's pretrial statements were not obtained in violation of Massiah or Miranda.  Furthermore, Gordon fails to show that any of the police conduct amounted to

an "extreme case where the government's activity is 'outrageous' or 'grossly shocking.'" See United States v. Smith, 538 F.2d 1359, 1361 (9th Cir. 1976) (government's involvement in having an informer participate in manufacturing illegal drugs did not constitute a due process violation). Claim 3 is therefore DENIED.

### III.    Trial Court Errors

#### A.    Claim 9: Jailhouse Letters

In Claim 9, Gordon alleges that the trial court erroneously admitted Gordon's jailhouse letters, which were written involuntarily due to her medical and mental state, in violation of her rights under the Fifth and Fourteenth Amendments. Pet. at 43–45. Gordon asserts that when she wrote the letters asking friends and family members to lie on her behalf at trial, she was taking an antidepressant, which resulted in suicidal ideations, insomnia and anxiety. She also alleges that she was suffering from psychological disorders while awaiting trial and held in segregation, including alcohol abuse, situational anxiety disorder, and situational depression disorder, as well as delusional thoughts. Pet. at 44 and Exs. 18, 37, 39. Gordon argues that she was also dealing with repressed gender identity, which contributed to her altered mental state and the involuntariness and unreliability of the admissions in her jailhouse letters. Traverse at 56 and Exs. 80 and 83; Suppl. Traverse at 6–8. Citing Robinson v. United States, 144 F.2d 392, 406 (6th Cir. 1944), aff'd, 324 U.S. 282 (1945), Gordon argues that her jailhouse letters amounted to "involuntary confessions of guilt" and were therefore inadmissible and unreliable. Traverse at 57.

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. See Henry v. Kernan, 197 F.3d 1021, 1029–30 (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009)

(finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Supreme Court precedent under § 2254(d)). The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Colley, 784 F.2d at 990.

The court of appeal denied Claim 9 on procedural grounds and did not reach the merits of this claim. Accordingly, this claim is reviewed de novo, and the factual determinations of the state court are presumed correct under § 2254(e)(1). The state court found that Gordon's letters were not produced as a result of any law enforcement effort, and that "there is ample, indeed incontrovertible, evidence that the letters were purposefully written with full competence and awareness of their contents, as shown by the letters themselves and Petitioner's testimony regarding the letters." Pet., Ex. 60 at 19 (citing RT 1641–57). The trial transcript demonstrates that Gordon testified about why she asked people to lie for her in court. See RT 1642 ("Because at the time of these letters, I was in fear for my life, sir. And I felt that times were desperate, and that desperate measures were called for."). The record demonstrates, as the Sixth Circuit found in Robinson, that "[t]he letters were written without the slightest duress or constraint [and] were wholly voluntary." 144 F.2d at 406. Gordon cites no controlling circuit authority or clearly established Supreme Court authority finding prejudicial error in the admission of a petitioner's spontaneous, unelicited statements that she later asserts to have been written under duress or involuntarily, even in view of Gordon's allegations of a compromised mental state. Traverse at 56–58. See Oregon v. Elstad, 470 U.S. 298, 312 (1985) ("This Court has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver."). Accordingly, Claim 9 is DENIED.

**B.    Claim 19: Uncharged Prior Acts**

In Claim 19, Gordon alleges that the admission of evidence of prior, uncharged

sex offenses involving Doe No. 1 and Krystal W., and domestic violence incidents involving Jaimie M. and Krystal W., violated her rights to due process and a fair trial under the Fifth and Fourteenth Amendments. Pet. at 78–85. She argues that the state evidentiary rules permitting the admission of prior bad acts to show propensity violates her clearly established right to due process. Traverse at 98 (citing Patterson v. New York, 432 U.S. 197, 201–02 (1977) (state law governing criminal procedures "is not subject to proscription under the Due Process Clause unless 'it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental'")).

The last reasoned state court decision to address the merits of this due process claim is the opinion of the court of appeal, rejecting Gordon's argument on direct appeal that admission of this evidence pursuant to California Evidence Code §§ 1108, 1109 and 1101 violated due process.[2] Answer, Ex. C, slip op. at 12–14 (Cal. Ct. App. Sept. 29, 2010) (citing People v. Lewis, 46 Cal. 4th 1255, 1288–89 (2009) and People v. Falsetta, 21 Cal. 4th 903 (1999)) and Ex. E (Cal. Dec. 15, 2010) (denying petition for review). The state court denial of this claim was not contrary to, or an unreasonable application of,

_____

[2]     Gordon did not assert this due process claim in the state habeas proceedings, but the court notes that the superior court addressed a related habeas claim asserting trial error in admitting testimony from Gil Gordon about Gordon's prior molestation of Doe No. 1 when she was 5 years old, presented as Claim 10 in the state habeas petition before the superior court. This claim did not challenge the testimony as propensity evidence in her state court habeas petition, but rather asserted trial error in admitting Gil Gordon's testimony for presuming facts that were not in evidence without requiring the prosecutor to establish the supporting facts. Pet., Ex. 61 at 28; Answer, Suppl. Ex. K-49 (amended habeas petition filed in superior court). The superior court denied the claim of trial error and held that the trial court "carefully limited the purpose of this testimony, ruling that it was not received for its truth, but to show Jane Doe #1's father's state of mind, and to explain why Mr. Gordon had asked Jane Doe #1 about the molest . . . ." Pet., Ex. 60 at 11-12 (citing RT 1467, 1483). Because the superior court's order denying the state court habeas petition did not adjudicate the merits of the due process challenge presented in Claim 19, the court looks to the decision of the court of appeal as the last reasoned state court decision to adjudicate the merits of this due process claim. See Greene v. Lambert, 288 F.3d 1081, 1086-87 (9th Cir. 2002).

United States District Court
Northern District of California

clearly established federal law.

As respondent correctly points out, the Ninth Circuit has recognized that the Supreme Court expressly reserved the question in Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991), "whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime." Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008) (citing Alberni v. McDaniel, 458 F.3d 860, 866 (9th Cir. 2006)). In Mejia, the Ninth Circuit upheld the denial of a claim for habeas relief asserting that admission of evidence of the petitioner's prior uncharged sexual offenses against his daughter at his jury trial for sexual offenses and other crimes violated due process. The court in Mejia found "no Supreme Court precedent establishing that admission of propensity evidence, as here, to lend credibility to a sex victim's allegations, and thus indisputably relevant to the crimes charged, is unconstitutional," and further held that the state court's decision that the propensity evidence introduced against the petitioner did not violate his due process was not an unreasonable application of general due process principles. Mejia, 534 F.3d at 1046–47. See also Larson v. Palmateer, 515 F.3d 1057, 1066 (9th Cir. 2008) (no clearly established due process right against admission of prior crimes to show propensity). In light of this circuit authority holding that admission of propensity evidence is not contrary to, or an unreasonable application of, clearly established law, controlling precedent "squarely forecloses" Gordon's claim that admission of prior uncharged offenses as propensity evidence violated her right to due process. Mejia, 534 F.3d at 1046. Accordingly, Claim 19 is DENIED.

## IV.  Ineffective Assistance of Trial Counsel Claims

Gordon asserts several ineffective assistance of trial counsel claims: Claim 4, which is related to the errors asserted in Claims 1–3, and Claims 7, 11, 12 and 13. Claims 15 and 16 asserting ineffective assistance of trial counsel and appellate counsel, respectively, concerning constitutional challenges to her sentence, as alleged in Claim 14, are discussed in Section V, below. Gordon suggests that, in reviewing her ineffective

United States District Court
Northern District of California

1   assistance claims, this court must disregard the factual findings of the superior court in

2   denying the state habeas petition, and instead must assume the factual allegations of her

3   habeas petition to be true because the California Supreme Court assumed the truth of

4   these assertions in summarily denying the claims of ineffective assistance of counsel.

5   Traverse at 51, 63 (citing Pinholster, 563 U.S. at 182).

6       AEDPA requires a district court to presume correct any determination of a factual

7   issue made by a state court unless the petitioner rebuts the presumption of correctness

8   by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); Miller-El, 537 U.S. at 340.

9   Federal habeas law employs a presumption to "look through" a silent state higher court

10  opinion to the reasoned opinion of a lower court in order to determine the reasons for the

11  higher court's decision.  Wilson v. Sellers, 138 S. Ct. 1188, 1193, 1197 (2018).  Gordon

12  offers no authority recognizing that the factual allegations in a habeas petition are entitled

13  to deference over the factual findings made by the state court.  The court looks through

14  the California Supreme Court's denial of the ineffective assistance claims to the order of

15  the Napa County Superior Court as the last-reasoned state court decision to address the

16  merits of the ineffective assistance claims.  Pet., Exs. 60, 76, 79.

17      Because the California Supreme Court denied Gordon's claims of ineffective

18  assistance of trial counsel and ineffective assistance of appellate counsel on the merits,

19  including Claim 12 as supplemented by the newly exhausted evidence of gender

20  dysphoria, the court applies AEDPA's deferential standard on federal habeas review of

21  the state court's denial of the ineffective assistance of counsel claims.  Richter, 562 U.S.

22  at 103 ("if the state court denies the claim on the merits, the claim is barred in federal

23  court unless one of the exceptions to § 2254(d) set out in §§ 2254(d)(1) and (2) applies").

24  See Pet., Ex. 79 (Cal. Supreme Court order denying state habeas petition on the merits

25  with respect to ineffective assistance of counsel claims); Suppl., Answer Ex. Q (Cal.

26  Supreme Court order denying second habeas petition under In re Miller).  Clearly

27  established Supreme Court authority disposes of Gordon's contention that her ineffective

28  assistance of counsel and other habeas claims that were summarily denied on the merits

by the state court are subject to de novo review. Traverse at 20–24. See Richter, 562 U.S. at 96, 100 (where the California Supreme Court issued "a one-sentence summary order" denying Strickland claims, "this Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'").

### A. Claim 4: Ineffective Assistance of Counsel

In Claim 4, Gordon claims that trial counsel was ineffective in failing to object to the admission of Gordon's pretrial statements. As the state supreme court issued a postcard denial on the merits of the claims of ineffective assistance of counsel, including Claim 4, and the court of appeal denied Claims 1 through 4 on procedural grounds, the court looks to the findings and conclusions of the Napa County Superior Court as the last reasoned decision for review of the state court's denial of Claim 4. See Ylst, 501 U.S. at 801–06; Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Gordon fails to demonstrate that the state court's denial of Claim 4 was contrary to, or involved an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1).

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance, of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Id.

In order to prevail on a Sixth Amendment ineffectiveness of trial counsel claim, a petitioner must establish two things. First, he must establish that trial counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Strickland, 466 U.S. at 687–88. Second, he must establish that he was prejudiced by trial counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.

Gordon contends that trial counsel was ineffective in failing to object to the introduction of Gordon's pretrial statements under Massiah, and in failing to object to the introduction of the interrogation statement under Miranda, as well as on the grounds of outrageous government conduct. Pet. at 31–34. As the underlying Claims 1, 2 and 3 lack merit, Gordon fails to show either that trial counsel's performance fell below an objective standard of reasonableness, or that counsel's errors caused prejudice. Accordingly, the decision of the state court was not contrary to, or an unreasonable application of, clearly established federal law. Claim 4 is DENIED.

### B. Claim 7: Ineffective Assistance of Counsel for Failing to Object to Exclusion of Impeachment Evidence

In Claim 7, Gordon contends that she was denied effective assistance of trial counsel due to trial counsel's failure to object to the exclusion of exculpatory evidence on the grounds that the exclusion violated Gordon's right to confront witnesses against her and to have compulsory process for obtaining witnesses in her favor. Pet. at 41–42 (incorporating allegations and arguments raised in Claims 5 and 6).

In Claim 7, Gordon contends that trial counsel should have objected to exclusion of evidence that should have been admitted to impeach Doe No. 1 and Doe No. 2, as summarized below. This ineffective assistance claim incorporates the allegations that impeachment evidence was improperly excluded as set forth in Claims 5 and 6, which sought habeas relief based on trial court error in violation of state law and were dismissed in the order to show cause. Dkt. 18.

(a) Connie Gordon's testimony, about specific instances in her personal experience with Doe No. 1's truthfulness or lack of truthfulness, was excluded pursuant to California Evidence Code § 1103 as reputation evidence against a victim of sexual assault, RT 1507–08. Gordon contends that Mrs. Gordon, her mother, would have testified about (i) Doe No. 1's diversion and probation status,

33

which would show that Doe No. 1 was motivated to fabricate that she was raped to avoid punishment for violating her diversion contract and probation by being intoxicated, alone in Gordon's presence, and out past her curfew; (ii) Mrs. Gordon's conversation with Doe No. 1 about her prior sexual activity, which would impeach Doe No. 1's testimony, RT 882 and 885, and statements during the investigation that she was a virgin at the time of the rape; (iii) specific incidents of Doe No. 1's dishonesty which would have revealed that she consistently lied to the Gordons, police officers and school counselors, which was probative of Doe No. 1's truthfulness. Pet. at 34–38.

(b)     Gordon's testimony, that Doe No. 1 was "partying a lot" around the time of the rape, was excluded for lack of personal knowledge, RT 1585. Gordon contends that she knew that Doe No. 1 used drugs based on her observations and Doe No. 1's statements to her about getting drunk and using drugs, which would show that Doe No. 1 had a motive to lie to avoid punishment for violating the terms of her diversion contract and probation. Pet. at 36 and Exs. 4, 38. Gordon also argues that evidence that Doe No. 1 was using drugs and alcohol would undermine her testimony because she was intoxicated at the time of the alleged rape. Pet. at 38.

(c)     Doe No. 2 was not cross-examined about using methamphetamine while she and Gordon made a pornographic video a year before the alleged rape because the trial court precluded additional questioning about the video recording pursuant to California Evidence Code § 782, which governs evidence of sexual conduct offered to attack the credibility of the complaining witness. RT 617, 809–12. Gordon argues that trial counsel should have objected to the exclusion of this evidence which would have impeached Doe No. 2's testimony denying that she had a drug or alcohol problem at the time of the rape, that she smoked methamphetamine on the night of the rape, or that taking methamphetamine ever made her "loopy" from staying awake for "several days in a row, which I never was

because I didn't do it all the time."  Pet. at 38–42; RT 620, 624–28, 834.

(d)     Connie Gordon was not permitted to testify that Doe No. 2 was addicted to methamphetamine, marijuana, and alcohol for years prior to and after the alleged rape; when Mrs. Gordon testified that she did not ask Doe No. 2 whether Gordon raped her because Doe No. 2 used drugs, the trial court asked Mrs. Gordon to clarify whether she meant that it wouldn't have mattered what Doe No. 2 said because she wouldn't have believed Doe No. 2 anyway, and Mrs. Gordon testified, "I felt she was in an altered state, yes, that I probably would not have taken everything she said as fact."  RT 1515–18.  Contrary to Gordon's argument, the record does not reflect that the trial court prohibited Mrs. Gordon from testifying about Doe No. 2's drug use.  RT 1516 ("I'll let you finish the answer, but don't forget to tell him in the end of this, tie it altogether and say why you didn't ask if it was true that day.").  Gordon argues that trial counsel should have argued that exclusion of the impeachment evidence against Doe No. 2 violated her rights to confront witnesses against her and to compulsory process of witnesses in her favor, and that Gordon was prejudiced by the exclusion of evidence that would have challenged Doe No. 2's credibility, given the trial court's finding that Doe No. 2 "was one of the most believable witnesses I've ever seen, period."  RT 1699.

The state court denied this ineffective assistance claim, presented as Claim 19 in the state habeas petition before the superior court, after determining that there was no error or prejudice due to the trial court's exclusion of the impeachment evidence.  Pet., Ex. 60 at 12–16.  Gordon argues that trial counsel was ineffective by failing to argue that the excluded evidence was material because it challenged the victims' credibility, established their motives to lie, and proved that Gordon reasonably believed that both victims consented to having sex.  The Supreme Court "has never held that the Confrontation Clause entitles a criminal defendant to introduce extrinsic evidence for impeachment purposes."  Nevada v. Jackson, 569 U.S. 505, 512 (2013).  Gordon fails to show that trial counsel's performance fell below an objective standard of reasonableness

where trial counsel attempted to introduce evidence and the trial court ruled that the evidence was inadmissible. "[A] failure to introduce evidence that is clearly inadmissible cannot be prejudicial, because there is no chance that the jury ever would have heard that evidence." Cannedy v. Adams, 706 F.3d 1148, 1163 (9th Cir.), amended on denial of reh'g, 733 F.3d 794 (9th Cir. 2013).

Further, Gordon fails to show that the failure to object to the exclusion of this evidence was prejudicial, where other evidence at trial established the victims' drug and alcohol use to impeach their testimony denying drug or alcohol use. See Plascencia v. Alameda, 467 F.3d 1190, 1201–02 (9th Cir. 2006) (exclusion of cross-examination that would have provided cumulative or repetitive evidence did not violate Confrontation Clause or was harmless error). In particular, Doe No. 2 admitted to using methamphetamine "once in a blue moon," and her friend Marlene Maple testified that she and Doe No. 2 used methamphetamine on the day of the rape. RT 620, 1416. As found by the superior court, Doe No. 1 testified at trial that she had been drinking the night she was raped and the trial court had evidence that she was in fact intoxicated based on her blood alcohol level. Pet., Ex. 60 at 16 (citing RT 898, 1318). With respect to Gordon's argument that Doe No. 1 had a motive to lie about being raped in order to avoid consequences for violating her diversion contract and probation, the state court held that "cutting school and lying about it is not connected logically to lying about being raped, nor is a false report of rape shown to be Jane Doe #1's habit on account of trying to cover up her truancy and her other adolescent misbehaviors." Pet., Ex. 60 at 14. In light of the record, the state court reasonably determined that Gordon was not denied effective assistance of trial counsel for failure to object to the exclusion of evidence to impeach Doe No. 1 and Doe No. 2. Claim 7 is therefore DENIED.

## C.    Claim 11: Failure to Investigate

In Claim 11, Gordon asserts that trial counsel was ineffective in not conducting an adequate factual and legal investigation of exculpatory and mitigating issues, particularly in support of her defense that she had a mistaken but reasonable belief that Doe No. 1

and Doe No. 2 consented. Gordon also argues that trial counsel should have met with her pretrial and developed a meaningful attorney-client relationship. Pet. at 46–52. The state supreme court issued a postcard denial of this habeas claim on the merits. Answer, Ex. I. In the last reasoned state court decision to address the merits of this ineffective assistance claim, the superior court determined that there was no basis to find that trial counsel failed to investigate the case on any of the grounds asserted by Gordon, as discussed below. Pet., Ex. 60 at 20–23.

A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Strickland, 466 U.S. at 691. See Hinton v. Alabama, 571 U.S. 263, 274 (2014) (per curiam). Strickland directs that "'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 691). Counsel need not pursue an investigation that would be fruitless or might be harmful to the defense. Richter, 562 U.S. at 108. In light of the evidence before the state court, the state court denial of habeas relief for ineffective assistance of counsel for failure to investigate was not unreasonable.

(1)    Gordon contends that trial counsel failed to develop a meaningful attorney-client relationship, having met with her twice, at most, before trial, failing to keep her apprised of the legal proceedings, attempting to get Gordon to plead guilty, and failing to communicate significant details about her case. Traverse at 59–60. The state court's denial of habeas relief on this ground was reasonable, Pet., Ex. 60 at 20, as the Sixth Amendment does not guarantee a "meaningful relationship" between an accused and her counsel. Morris v. Slappy, 461 U.S. 1, 13–14 (1983); see Plumlee v. Masto, 512 F.3d 1204, 1210–11 (9th Cir. 2008) (en banc).

(2)    Gordon contends that trial counsel failed to develop and present evidence that Gordon had a reasonable but mistaken belief that Doe No. 1 and Doe No. 2 consented to having sex as a defense to the rape and sodomy by force charges in

Counts 1, 3 and 4. Traverse at 60–61. The state court denied this claim after finding that trial counsel indeed argued that Gordon believed that she had consent, and that trial counsel asked Gordon questions during direct examination to support the defense theory that she believed the victims consented to having sex with her. Pet., Ex. 60 at 21 (citing RT 1560, 1685, 1691).

The state court record reflects that trial counsel argued in closing that, with respect to the charge of forcible rape of Doe No. 1, the evidence did not prove "beyond a reasonable doubt that the defendant didn't believe he had consent," in light of evidence that there was an act of unsolicited oral copulation before intercourse, that there were no external injuries or torn clothing, and that Doe No. 1's credibility was impeached based on her "reputation for untruthfulness," her inconsistent statements including prior testimony under oath, and her "motive for accusing the defendant of rape." RT 1681–1686, 1691–92. With respect to the sex offenses against Doe No. 2, trial counsel argued in closing that "the defendant had no reason to believe that the sex that he had with Doe No. 2 was non-consensual, until he attempted to have anal intercourse with her;" that Doe No. 2 was not credible given the evidence refuting her testimony that she did not use methamphetamine on the day of the incident and showing that she had a motive to lie; and that she and Gordon had a history of rough sex between the two of them. RT 1690–91. Based on this record, the state court reasonably determined that trial counsel did not fail to adequately investigate and present the defense that Gordon reasonably but mistakenly believed she had consent.

(3)     Gordon argues that trial counsel failed to investigate certain aspects of the prosecution's case regarding Doe No. 2.

(a)     Gordon contends that trial counsel failed to investigate the extent of Marlene Maple's methamphetamine use and dealing, though Gordon acknowledges that Maple testified on direct examination that she used methamphetamine with Doe No. 2 on the day of the crime, and that trial counsel elicited on cross-examination that Maple provided Doe No. 2 with

38

methamphetamine.  Gordon argues that trial counsel should have investigated Maple's drug dealing to impeach her testimony denying that she ever charged Doe No. 2 for the drugs or that she used methamphetamine with anyone else around the time of the rape.  Traverse at 61–62 (citing RT 1422–23).  Gordon argues that Maple testified that Doe No. 2 discussed the alleged crime days after it occurred, and that evidence of Maple's involvement in drug sales would have undermined her credibility and "put doubts in the jury's mind about her candor during her testimony," although this case was tried before a judge.  Traverse at 62.  The state court found "no apparent connection between lying that a victim reported that she had been raped, and supplying the victim with drugs," and noted that Maple's drug use was disclosed during her testimony.  Pet., Ex. 60 at 21.  In light of the record before the state court, the state court reasonably determined that there was no basis to find that trial counsel did not investigate and present evidence of Maple's "use and supply of methamphetamine to undermine her credibility, nor that the trial court was uninformed of this."  Id.

(b)     Gordon argues that trial counsel failed to investigate and present testimony by Zach McClusky that Doe No. 2 used methamphetamine on the day of the alleged rape to impeach Doe No. 2, who the trial court found to be "one of the most believable witnesses I've ever seen, period."  Traverse at 62–63 (citing RT 1699).  Gordon contends that trial counsel never learned what McClusky would have said, and that this failure to locate and approach the witness was deficient and prejudicial.  The state court held that there was no failure to investigate and use the information about Doe No. 2's drug use, after determining that there was "no dispute that McCluskey and Jane Doe #2 had sex the day of the rape.  This information would have added more force to the Petitioner's motive to rape Jane Doe #2.  Also, Maples [sic] testified that Jane Doe #2 had used methamphetamine on the day of the rape."  Pet., Ex. 60 at 22.  The duty to investigate and prepare a defense does not require that every conceivable witness be interviewed.

United States District Court
Northern District of California

Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). In light of the record indicating that Maple's testimony established that Doe No. 2 used drugs on the day of the rape, the state court denial of habeas relief for failure to investigate and call McClusky to testify about Doe No. 2's drug use was not unreasonable.

(c)     Gordon contends that trial counsel rendered ineffective assistance by failing to investigate and present evidence of Doe No. 2's sexual practices with Gordon and other men. Pet. at 47–48 and Ex. 38. In the last reasoned state court decision to address the merits of this claim, the superior court found, "In fact, at trial there was significant testimony as to rough sex with Jane Doe #2. [RT 1545–48.] It is clear that Petitioner's attorney did investigate and utilize this aspect of Petitioner's defense. There was no limitation on Petitioner's opportunity to discuss this with his lawyer, and the transcript makes it clear that Petitioner did understand the possible defense of this type of sex on the charges against him." Pet., Ex. 60 at 22. In light of the evidence before the state court, the state court reasonably denied habeas relief on this ground.

(d)     Gordon argues that trial counsel failed to investigate Doe No. 2's inconsistent statements about the sequence of the alleged rape and sodomy, to determine if the acts occurred on separate occasions within the meaning of Cal. Penal Code § 667.6, and failed to investigate evidence to show Doe No. 2's knowledge that Gordon was represented by counsel, the extent of information provided about the case by Detective Elia, statements Doe No. 2 made to Detective Elia about the alleged crimes, and Doe No. 2's statements to Gordon that she was sorry for talking to police and would remit her statements. Pet. at 47–48. Gordon fails to show how trial counsel was deficient in any of these areas of investigation and how any deficient performance in lacking this investigation was prejudicial in light of the evidence presented in the state court proceedings, particularly Gordon's own admissions about the sexual activity between herself and Doe No. 2 on the day in question. RT 1558–61. The last reasoned state

court decision on the merits of Gordon's claim that trial counsel failed to investigate Doe No. 2's initial reluctance to press charges, presented as Claim 25(6)(d) in the habeas petition before the superior court, found no evidence to support Gordon's speculative argument that there was "misconduct by the prosecutor that somehow induced Jane Doe [No. 2] to confabulate her testimony." Pet., Ex. 60 at 22. The state court denial of this claim was not unreasonable.

(4) Gordon contends that trial counsel failed to investigate impeachment evidence against Doe No. 1 and other aspects of the prosecution's case involving Doe No. 1:

(a) Gordon argues that trial counsel failed to contact Victor Rodriguez and Kayla Chromer to investigate Doe No. 1's prior sexual activity, her whereabouts prior to the crime, and her intoxication before arriving at the Bristol apartments where Gordon was staying on the night of the crimes. Pet. at 48. Gordon contends that this evidence would have demonstrated Doe No. 1's lack of credibility, but as the state court found, the trial court had ample evidence of Doe No. 1's intoxication on the night of the rape. Pet., Ex. 60 at 22–23 (citing RT 872, 917). The duty to investigate and prepare a defense does not require that every conceivable witness be interviewed. Hendricks, 70 F.3d at 1040. This claim fails to establish that counsel's performance was deficient or prejudicial.

(b) Gordon argues that trial counsel failed to investigate Dylan Palmer, Doe No. 1's boyfriend, whom Gordon called on the night of the alleged rape. Gordon contends that trial counsel should have investigated Palmer's statements to Detective Elia that on the night of the rape, Gordon asked Palmer to pick up Doe No. 1, that Palmer told Gordon he could not pick her up and did not want her to walk to his house because she was drunk and on probation, and that he did not hear Doe No. 1 yelling in the background. Gordon contends that these facts would have impeached Doe No. 1 by demonstrating that she was on probation, violated her probation on the night of the alleged rape, and gave a statement to police that

did not match Palmer's recollection or her testimony at trial. Pet. at 48–49 and Exs. 8, 10; Traverse at 65–66; RT 874–75. As further discussed in part (c) below, the state court reasonably found that Doe No. 1's diversion contract could not have influenced the trial court's evaluation of Doe No. 1's credibility, particularly in light of the trial court's acknowledgement that Doe No. 1 had credibility problems. RT at 1697–98. Gordon withdraws the argument that Doe No. 1 claimed to be yelling in the background when Gordon called Palmer. Traverse at 66.

(c) Gordon contends that trial counsel should have investigated Doe No. 1's truancies from school in violation of the terms of her diversion contract and probation, and the court order to terminate Mr. and Mrs. Gordon's guardianship of Doe No. 1, noting their allegations that Doe No. 1 violated her diversion contract with law enforcement. Pet. at 48–49 and Exs. 3, 24. Gordon also alleges that trial counsel was ineffective for not investigating Doe No. 1's MySpace communications where she told Doe No. 2 that she was using drugs, which violated her probation, and where Doe No. 2 admitted that after she left Gordon, she was partying, smoking weed and drinking. Pet. at 50.

The state court rejected this claim after finding that "[t]here was no question during the trial that Jane Doe #1 was under the influence," and that the trial court "could have had no doubt as to this," given that she admitted being drunk on both direct and cross-examination. Pet., Ex. 60 at 22–23 (citing RT 872, 917). In his June 12, 2012, declaration, trial counsel explained that he "did not see any point in stressing Jane Doe #1's intoxication, if any, because in my view it would have aggravated defendant's conduct, and opened the door to evidence of a violation of Penal Code Section 261(a)(3)." Answer, Ex. J ("Lernhart Decl.") ¶ 22. The state court also found that Doe No. 1's "diversion contract could have not had any influence on the court's evaluation of Jane Doe #1's credibility, as counsel determined," noting that trial counsel did have this contract. Pet., Ex. 60 at 22–23. See Lernhart Decl. ¶ 13.

To the extent that Gordon argues that the victims' MySpace communications would have demonstrated Doe No. 2's drug use, such evidence, even if relevant, would have been cumulative in light of the state court's finding that the evidence showed that Doe No. 2 used drugs on the day of the rape. Pet., Ex. 60 at 22. <u>See</u> Lernhart Decl. ¶ 25. In light of the evidence presented in the state court proceeding, Gordon fails to show that trial counsel's performance was either deficient or prejudicial, and the state court's denial of this claim was not unreasonable. <u>Siripongs v. Calderon</u>, 133 F.3d 732, 734 (9th Cir. 1998) ("Where the attorney has consciously decided not to conduct further investigation because of reasonable tactical evaluations, the attorney's performance is not constitutionally deficient.").

(d) Gordon argues that trial counsel failed to investigate Doe No. 1's blood alcohol content and establish her motive to lie about being raped to avoid punishment for violating the conditions of diversion contract and probation. Pet. at 49–50 and Exs. 5, 46; Traverse at 67. Though Gordon concedes that evidence of Doe No. 1's intoxication was admitted at trial, she argues that the digital test results showing Doe No. 1's blood alcohol content to be 0.14 percent on November 16, 2008, Pet., Ex. 9, would have corroborated evidence that Doe No. 1 was intoxicated and demonstrated it graphically. Traverse at 67. As discussed in part (c) immediately above, the state court determined that evidence of Doe No. 1's intoxication was before the trial court, and that violation of the diversion contract would not have influenced the trial court's credibility determination. Pet., Ex. 60 at 22–23. The record reflects that the evidence of Doe No. 1's intoxication was presented at trial, including her own admissions, the testimony of the officer who took her to the hospital, and testimony about her blood alcohol level from PAS test results, RT 868, 872–75, 879–81, 1317–18, 1407–09, and that trial counsel's closing argument challenged Doe No. 1's credibility, including her motive to accuse Gordon of rape so as to avoid living with her grandparents whose rules

43

1    she did not want to follow, RT 1691–92.  In light of the state court record, Gordon

2    fails to show that trial counsel's performance fell below an objective standard of

3    reasonableness or was prejudicial, and the state court's denial of this claim was

4    not unreasonable.

5             (e)    Gordon contends that trial counsel failed to investigate and present

6    evidence of Doe No. 1's prior inconsistent statements to Detective Elia and Sexual

7    Assault Victim Advocate Judy Durham after the rape.  Pet. at 50.  Specifically,

8    Gordon argues that Doe No. 1 stated during the police interview that she did not

9    object to having sex with Gordon for over five minutes, which contradicted her trial

10   testimony that she immediately told Gordon that she did not want to have sex, and

11   that Gordon told Palmer that Doe No. 1 would not go to his house that night, which

12   contradicted Doe No. 1's testimony that Gordon called Palmer to see if she could

13   get a ride to Palmer's house.  Traverse at 67–68 (citing RT 874, 882 and Pet., Ex.

14   8, 11).  The state court record reflects that many inconsistencies in Doe No. 1's

15   prior statements were presented at trial; in particular, trial counsel questioned Doe

16   No. 1 on cross-examination about other prior inconsistent factual statements, such

17   as whether she walked or got a ride to the Bristol apartments, and about her

18   conduct with Gordon on the night of the rape.  RT 902–05, 908–923.  The trial

19   court even found that Doe No. 1 "is capable of lying and has lied in the past."  RT

20   1697.  The state court's denial of this claim was not unreasonable in light of the

21   state court record, which shows that Doe No. 1's additional inconsistent

22   statements, which Gordon argues should have been raised by trial counsel on

23   cross-examination, would have been cumulative impeachment evidence.

24            (f)    Gordon argues that trial counsel failed to investigate Doe No. 1's

25   inconsistent statements about the assault to the Sexual Assault Response Team

26   ("SART") nurse, Vickie Whitson, during her SART exam and to Detective Elia.

27   Pet. at 49 and Exs. 7, 8, 11.  Gordon contends that trial counsel should have

28   investigated and introduced these inconsistent statements to impeach Doe No. 1,

but as discussed in part (e) above, trial counsel focused on Doe No. 1's other inconsistent statements to impeach her. The record reflects that Detective Elia herself noted Doe No. 1's inconsistencies in her report of Doe No. 1's interview, which pointed out that "[a]fter speaking with her for several minutes, the victim changed her story about what had happened." Pet., Ex. 8 at 0048.

Gordon also claims that trial counsel failed to retain his own sexual assault expert to investigate the SART examination of Doe No. 1, the forensic report and the SART photos. Pet. at 49. Trial counsel stated that he "did not think there was an issue as to whether or not defendant had sexual intercourse with Jane Doe #1 because he had admitted that he had such intercourse on several occasions, and so testified during the course of the trial;" and that he was not concerned with DNA evidence or "evidence of forcible rape because Jane Doe #1 had previously testified under oath that she did not object to the intercourse until after intercourse was occurring and she told him to stop." Lernhart Decl. ¶ 15. Gordon has not demonstrated how another expert would have assisted the defense or reached a different conclusion than the SART nurse, RT 1362–68. See Bible v. Ryan, 571 F.3d 860, 871 (9th Cir. 2009) (speculation about what further investigation and testing may have shown is not sufficient to establish prejudice). Upon review of the state court record, the court determines that Gordon has not demonstrated either that trial counsel's performance was objectively unreasonable or that any deficient performance caused prejudice.

(g) Gordon contends that trial counsel failed to investigate and present evidence that Mrs. Gordon was not subject to criminal liability for a crime against public justice, which Gordon argues would have rehabilitated her credibility after Officer Davis testified that Mrs. Gordon held her hand over Doe No. 1's mouth when she told him that she had been raped. Pet. at 49–50 and Ex. 28. Gordon contends that trial counsel should have investigated the district attorney's decision that Mrs. Gordon was not criminally liable to support her credibility and impeach

45

Officer Davis after the prosecution discredited Mrs. Gordon when she did not recall covering Doe No. 1's mouth. Traverse at 69 (citing RT 1313–15, 1522–23). Gordon points to no evidence in the record that the prosecutor suggested Mrs. Gordon would be criminally liable for covering Doe No. 1's mouth, where the trial transcript reflects that he argued that she was untruthful in testifying that she was merely trying to hold Doe No. 1 in the car. RT 1692. Gordon does not demonstrate the relevance or probative value of the district attorney's subsequent determination, that Mrs. Gordon was not criminally liable, to the trial court's credibility determination between Officer Davis and Mrs. Gordon's accounts. Upon review of the state record, the court determines that the state court's denial of this claim was not unreasonable where Gordon has not shown either deficient performance or prejudice.

(h)     Gordon argues that trial counsel failed to investigate Timothy Grabner's prior misdemeanor convictions to impeach his credibility, though Gordon acknowledges that Grabner's felony burglary conviction was introduced at trial. Traverse at 70–71 and Ex. 36. The state court addressed this argument in the context of Claim 17 alleging a Brady violation and the related ineffective assistance argument in Claim 12 asserting discovery failures, finding that Grabner's misdemeanor convictions did not involve moral turpitude and would not have affected the trial court's credibility determination or the outcome of the case. Pet., Ex. 75 at 20–24. In light of the evidence in the record, the state court reasonably denied this ineffective assistance claim.

(5)     Gordon contends that trial counsel was ineffective for failing to investigate evidence to support her Massiah and Miranda claims.

(a)     Gordon contends that trial counsel failed to investigate audio recordings of her jailhouse calls, to establish that she retained counsel and invoked her right to counsel in November 2008, in support of her Massiah claim that her statements made after her arrest were inadmissible. Pet. at 50–51 and

46

1    Exs. 16, 21. As more fully set forth in the discussion of Claim 1, above, Gordon's

2    right to counsel under <u>Massiah</u> attached when formal proceedings were initiated

3    on April 1, 2009. Trial counsel's performance was not deficient for failure to

4    investigate Gordon's jailhouse calls more than four months earlier.

5           (b)    Gordon argues that trial counsel failed to investigate and discover

6    evidence of audio recordings of her arrest by Napa police officers indicating that

7    she smelled like alcohol and that she admitted to drinking alcohol prior to her

8    interrogation, which she contends would establish that her interrogation

9    statements were involuntary. As discussed more fully with respect to the <u>Brady</u>

10    violations alleged in Claim 17, below, the state court reasonably found that the

11    evidence relating to Gordon's arrest was not material under <u>Brady</u> on the question

12    whether she was intoxicated during her interrogation because the trial court had a

13    video recording of the actual interview with Detective Elia. Pet., Ex. 75 at 25–29.

14    Even if counsel unreasonably failed to investigate this evidence, any such attorney

15    error was not prejudicial. <u>See</u> <u>United States v. Olsen</u>, 704 F.3d 1172, 1187–1188

16    (9th Cir. 2013) (if withheld evidence is not material under <u>Brady</u>, its absence

17    likewise will not support an ineffective assistance of counsel claim).

18    The state court denial of this claim for ineffective assistance of trial counsel was neither

19    contrary to, nor an unreasonable application of, clearly established federal law.

20    Accordingly, Claim 11 is DENIED.

21        **D.**    **Claim 12: Litigation of Pretrial Issues**

22        In Claim 12, Gordon claims that trial counsel was ineffective for failing to litigate

23    material issues prior to trial. Pet. at 52–57. To determine whether the state court

24    decision denying this claim involved an unreasonable application of clearly established

25    federal law, the court looks to the order of the superior court as the last reasoned state

26    court decision to address the merits of this claim. Pet., Ex. 60 at 23–26 and Ex. 76

27    (adopting the factual findings).

28        (1)    Gordon alleges that trial counsel failed to file oppositions to motions in

47

limine filed by the prosecution:

       (a)     to voir dire the jury about sexual assault;

       (b)     to accommodate a child witness;

       (c)     to exclude witnesses from the courtroom except Detective Elia;

       (d)     to refer to the victims as Doe No. 1 and Doe No. 2;

       (e)     to introduce expert testimony concerning child sexual abuse
                accommodation syndrome;

       (f)     to introduce expert testimony concerning rape trauma syndrome;

       (g)     to introduce other sexual deviant acts by Gordon; and

       (h)     to introduce other incidents of domestic violence by Gordon.

Pet. at 52. The state court denied this claim, presented as Claim 26 in the habeas petition before the superior court, after determining that (a) Gordon waived a jury trial, obviating the need to respond to the motions directed to a jury trial; (b) state law permits the presence of a support person and it was "inconceivable that the court was somehow influenced by a support person sitting next to Jane Doe #1;" (c) it is a universal practice in criminal trials for the investigating officer to remain in court and there was no showing of, or basis to find, prejudice; (d)–(f) there was no basis to find that these routine motions had any unfair effect on the trial; (g)–(h) without specifically addressing sexual deviant acts, prior uncharged incidents of sexual offenses and domestic violence may be introduced under California Evidence Code §§ 1108 and 1109, which contain "explicit exceptions to the limitations of Ev. C. 101 regarding introduction of predisposition evidence in sex crimes." Pet., Ex. 60 at 23–24. The state court noted that trial counsel acted reasonably by requesting that Gordon's prior, uncharged acts be excluded, and that the evidence was admitted after the trial court weighed the issues under Cal. Evid. Code § 352. Pet., Ex. 60 at 24 (citing RT 526–29). The state court's denial of Gordon's claim that trial counsel was ineffective for failing to oppose these pretrial motions was not an unreasonable application of clearly established federal law. See Hebner v. McGrath, 543 F.3d 1133, 1137 (9th Cir. 2008) (finding counsel's failure to object to admission of

1   defendant's prior sexual misconduct as propensity evidence not ineffective where

2   evidence would have been admitted in any event to show common plan or intent).

3       (2)     Gordon alleges that trial counsel failed to object to the victims' contact with

4   advocate Judy Durham during trial on constitutional grounds.  Though Gordon concedes

5   that trial counsel objected to Durham's interaction with Doe No. 1 and the trial court

6   admonished them, she argues that trial counsel failed to seek a mistrial based on a

7   mistaken belief that there was no basis for mistrial since this was a court trial not jury trial.

8   Traverse at 73–76.  See RT 944–45.  The state court found that Durham explained on

9   the record "that her conversation with Jane Doe #1 was simply to define 'sustained,'" and

10  found "no evidence that Durham coached, advised, investigated or inappropriately

11  communicated with any witness or victim."  Pet., Ex. 60 at 26.  In light of the evidence

12  presented in state court, the denial of this claim did not involve an unreasonable

13  application of clearly established federal law.

14      (3)     Gordon contends that trial counsel was ineffective in failing to move to

15  sever the charges involving Doe No. 1 and Doe No. 2 based on material differences in

16  the alleged crimes and the inflammatory nature of the charges.  Pet. at 53, 55.

17  Acknowledging that "severance would have limited the District Attorney's opportunity to

18  argue that two victims made the crimes worse and required greater punishment," the

19  state court noted that this case was tried before a judge, dispelling the concern of undue

20  prejudice, and that there was no "lack of strength of the prosecution's case" that made

21  the joinder unlawfully prejudicial.  Pet., Ex. 60 at 24–25.  The denial of this claim by the

22  state court was not objectively unreasonable.

23      (4)     Gordon argues that trial counsel failed to object to introduction of Gordon's

24  jailhouse letters on the ground they were not authenticated and were involuntary because

25  Gordon was in isolation, using Elavil, and had suicidal ideations, as also alleged in

26  support of Claim 9.  Pet. at 53, 55.  Gordon further relies on newly exhausted evidence of

27  gender dysphoria in further support of the argument that Gordon's altered mental state

28  rendered the admissions in the jailhouse letters unreliable and involuntary.  Traverse at

49

72–73.  The court has considered this argument in support of Claim 9, above, including evidence of Gordon's struggles with gender identity, and found no due process error in the admission of these letters as involuntary or unreliable, in light of Gordon's own trial testimony addressing the letters.  RT 1641–57.

The state court denied this ineffective assistance claim by referring to the denial of Claim 9 asserting trial error in the admission of these letters.  Pet., Ex. 60 at 20. Addressing the merits of the argument that the jailhouse letters were involuntary and unreliable due to severe mental affliction caused by medication and alcohol withdrawal, the state court determined, "Since the letters were not produced as a result of any law enforcement effort, there is no basis for exclusion as involuntary statements."  Pet., Ex. 60 at 19.  Under settled authority that "trial counsel cannot have been ineffective for failing to raise a meritless objection," see Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005), the state court's denial of the ineffective assistance claim was not objectively unreasonable.

(5)     Gordon alleges that trial counsel was ineffective in failing to move to suppress Gordon's post-arrest interrogation statements, MySpace communications, pretext telephone call, and jailhouse letters.  Pet. at 56.  With respect to Gordon's pretrial statements, this Strickland claim is duplicative of Claim 4, which was reasonably denied by the state court.  With respect to Gordon's jailhouse letters, Gordon has failed to show that the letters were improperly admitted in violation of due process as alleged in Claim 9, and the state court's denial of the related ineffective assistance claim was not objectively unreasonable.  See Juan H., 408 F.3d at 1273.

(6)     Gordon alleges that trial counsel failed to move to exclude the uncharged bad acts involving domestic violence and uncharged sexual misconduct.  Pet. at 53, 56. Gordon argues that trial counsel should have requested a pretrial hearing to demonstrate that the alleged bad acts did not prove that she committed any criminal offenses. Traverse at 76–77.  The state habeas court noted the court of appeal's decision which determined that trial counsel challenged the admissibility of Gordon's prior acts of sexual

misconduct and domestic violence through in limine motions and at trial. Answer, Ex. C at 16. The court of appeal held that the trial court acted within its discretion in admitting evidence of the prior sex offenses and domestic violence, finding that "at the in limine hearing, the [trial] court did expressly articulate a lengthy Evidence Code section 352 analysis" and concluded there was no basis to exclude the evidence of the prior acts. Answer, Ex. C at 16–18. In denying the ineffective assistance claim, the state habeas court held that trial counsel acted reasonably by requesting that Gordon's prior, uncharged acts be excluded, and that the evidence was admitted after the trial court weighed the issues under Cal. Evid. Code § 352. Pet., Ex. 60 at 24 (citing RT 526–29). To the extent that Gordon claims that trial counsel was ineffective for failing to object on due process grounds, as argued in Claim 19, trial counsel's performance did not fall below an objective standard of reasonableness as there is no clearly established due process right against the admission of prior crimes to show propensity. In view of the state court record, the state court's denial of the ineffective assistance claim was not objectively unreasonable.

(7) Gordon alleges that trial counsel was ineffective by failing to move to admit evidence demonstrating that Gordon's character was good and non-violent. Pet. at 54. The state court denied this claim on the ground that "[t]rial counsel would have known of evidence showing Petitioner's negative character that would be introduced by the District Attorney in response to any introduction of evidence showing Petitioner's good character." Pet., Ex. 60 at 25. See Lernhart Decl. ¶ 23. As trial counsel made a reasonable tactical decision not to introduce Gordon's character evidence, the state court reasonably denied this claim. See Gulbrandson v. Ryan, 738 F.3d 976, 989 (9th Cir. 2013) (citing Bell v. Cone ("Cone I"), 535 U.S. 685, 700 (2002) (per curiam)).

(8) Gordon argues that trial counsel failed to move to admit evidence impeaching Doe No. 1 and Doe No. 2, such as evidence of the victims' use of drugs to impeach their credibility and to establish their habits of lying and using drugs. Pet. at 54–56. Gordon argues that evidence of the victims' sexual history should have been

admitted to impeach Doe No. 1's statements about being a virgin when Gordon sexually assaulted her and to impeach Doe No. 2 about her sexual practices with other men. Traverse at 77. As discussed above with respect to Claim 11 asserting trial counsel's failure to investigate evidence of the victims' drug and alcohol use and their prior sexual conduct to impeach Doe No. 1 and Doe No. 2, the state court's denial of this claim was not objectively unreasonable. Pet., Ex. 60 at 25–26.

(9)     Gordon argues that trial counsel failed to discover and introduce material evidence of audio or video recordings of Gordon's arrest, Doe No. 1's interview, and Dylan Palmer's interview; digital results of Doe No. 1's blood alcohol content; and Timothy Grabner's criminal history. Pet. at 53–54, 56 and Exs. 67, 11, 10, 9, 36 (respectively). Gordon fails to show that trial counsel was ineffective for the reasons discussed above with respect to the allegations in Claim 11 of trial counsel's failure to investigate this evidence, and for the reasons discussed as to Gordon's failure to establish the materiality of this evidence under <u>Brady</u> in support of Claim 17, below. <u>See Olsen</u>, 704 F.3d at 1187 ("<u>Brady</u> materiality and <u>Strickland</u> prejudice are the same") (citations and internal marks omitted). Accordingly, Gordon fails to demonstrate that counsel's failure to discover and produce this material was prejudicial under <u>Strickland</u>. The state court's denial of this ineffective assistance claim was not objectively unreasonable.

Accordingly, Claim 12 is DENIED.

**E.     Claim 13: Defense of Reasonable but Mistaken Belief of Consent**

In Claim 13, Gordon alleges that trial counsel was ineffective on several grounds in his presentation of Gordon's defense of reasonable but mistaken belief of consent as to Counts 1 (forcible rape of Doe No. 1), 3 (forcible rape of Doe No. 2) and 4 (sodomy by use of force). Pet. at 57–62. The last reasoned state court decision to address the merits of this claim is the order of the superior court issuing findings of fact, which were adopted in the order denying Gordon's habeas corpus petition. Pet., Exs. 60, 76.

(1)     Gordon argues that trial counsel failed to introduce evidence to rebut the

52

prosecution's case in chief by impeaching the victims' credibility and demonstrating the investigating detective's bias. Gordon reiterates allegations asserted in support of Claims 1 through 4, challenging the admission of Gordon's pretrial statements, and Claims 11 and 12, concerning trial counsel's failure to introduce evidence of the following:

(a) Doe No. 1's use of drugs and alcohol, to impeach her credibility based on violating her probation and rebutting the prosecution's argument that Gordon took advantage of her intoxication;

(b) prior contact among Detective Elia, Doe No. 1 and Gordon to show that Gordon did not take advantage of Doe No. 1 and that Detective Elia was biased;

(c) Doe No. 1 was not a virgin, to impeach her credibility about telling Gordon that she was a virgin to object to having sex;

(d) Gordon's relationship with Doe No. 2 was not abusive to rebut the prosecution's argument that Doe No. 2 did not report the rape because she was under duress from the abusive relationship;

(e) Gordon's open relationship with Doe No. 2 who routinely slept with other men and was having an affair with Marlene Maple's son, Chris Yoder, to refute the prosecution's argument that Gordon's motive for assaulting Doe No. 2 was to punish her infidelity and to show Maple's bias against Gordon;

(f) Doe No. 2's drug use to impeach her testimony that she did not have a drug problem and was not high at the time of the rape.

Pet. at 57–68. In light of the state court record, including trial testimony and cross-examination challenging the credibility of the victims and other witnesses, Gordon fails to demonstrate that the state court denial of habeas relief on these grounds was objectively unreasonable. Pet., Ex. 60 at 26–29. With respect to the particular allegation that trial counsel failed to introduce specific evidence to show Maple's bias against Gordon, any such error was not prejudicial in light of the state court record showing that trial counsel elicited on Maple's cross-examination that she had "animosity or bad feelings" toward

Gordon. RT 1423.

In addition to these alleged errors by trial counsel, Gordon also argues that trial counsel failed to introduce evidence challenging the prosecution's case in chief that would (i) challenge evidence of Gordon's alleged bad acts; (ii) impeach Maple and Timothy Grabner as well as the victims; (iii) undermine testimony about Doe No. 1's SART exam; (iv) undermine the reliability of Gordon's pretrial statements; (v) establish the outrageousness of Detective Elia's investigation; (vi) establish that Detective Elia's investigation tainted the victims' testimony; (vii) establish Gordon's good and non-violent character; (viii) establish with testimony from neighborhood witnesses that they did not hear screaming on the night of the rapes. Pet. at 60. In light of the evidence in the state court record, the state court's determination that Gordon failed to show deficient performance and prejudice from these alleged errors did not involve an unreasonable application of clearly established federal law. Pet., Ex. 60 at 27–29. In particular, trial counsel's performance was not deficient for failing to call neighbors to testify that they did not hear screaming where defense counsel elicited testimony by Detective Elia that she investigated whether anyone heard unusual sounds coming from the Elm Street address the night of the alleged assault on Doe No. 2, and that she did not locate any disturbance calls that were reported around the relevant time frame. 13 RT 1399. See Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir. 1984) (tactical decisions are not ineffective assistance even if in hindsight better tactics were available).

(2) Gordon argues that trial counsel should have argued and presented credible evidence to support a defense that Gordon was not guilty of Counts 1, 3 and 4 because she reasonably but mistakenly believed that Doe No. 1 and Doe No. 2 consented to having sex. Pet. at 61. In particular, Gordon argues that trial counsel failed to investigate and present the following evidence to corroborate Gordon's testimony that she believed that Doe No. 1 and Doe No. 2 consented to the sexual encounters, and to show that her belief was reasonable: Doe No. 2's sexual practice with Gordon after having sex with other men and her sex video with Gordon; Doe No. 1's failure to object to

54

having sex with Gordon initially; Gordon's intoxication on the nights of both rapes. Pet. at 58–59. Gordon also argues that trial counsel failed to inform her of the elements of her defense and prepare other defense witnesses for testimony. Pet. at 59.

As Gordon concedes, she admitted to Count 2, oral copulation with a minor without force, and Count 5, battery on a cohabitant. Traverse at 82; Answer at 41. See 10 RT 595–97; 14 RT 1561; 15 RT 1603–05, 1623. Gordon also admitted the sexual activity with Doe No. 1 and Doe No. 2, but denied rape, testifying that Doe No. 1 was drunk and agreed to have sex if Gordon gave her more alcohol and that Doe No. 2 enjoyed aggressive sex and had a sadomasochistic sexual relationship with Gordon. Answer at 41. See 14 RT 1545–47, 1557; 15 RT 1601–07, 1666–67. The state court found not only that trial counsel presented the defense of reasonable but mistaken belief in consent, Pet., Ex. 60 at 21, but also that trial counsel's presentation of the reasonable but mistaken belief of consent was restricted by Gordon's insistence of actual, unmistakable consent, "disregarding trial counsel's advice that it was best that he limit his testimony, but Petitioner was 'adamant on telling the judge why he did what he did' [i.e. that he had gotten actual consent]." Pet., Ex. 60 at 27 (citing Lernhart declaration at p.4). In the face of the victims' testimony regarding the absence of consent, which was subject to impeachment as shown in the record, Gordon's sworn testimony claiming the existence of actual, unmistakable consent was not credible, as the trial court found that "the defendant, of course, is his own worst enemy." RT 1697. In denying this claim, the state court held that "[t]rial counsel was not ineffective for presenting the version of events that his client insisted on, and asking questions and making arguments to show reasonable belief in consent (contrary to Petitioner's insistence otherwise) rather than attempting to direct his client to present another version." Pet., Ex. 60 at 27. The state court's denial of this claim was not unreasonable.

(3)     With respect to other evidence to support the defense of reasonable but mistaken belief of consent, Gordon makes the following arguments in support of her claim that trial counsel provided ineffective assistance by failing to introduce material

55

1    evidence that was in his possession.  Pet. at 59–60.  In the absence of a reasoned state

2    court decision addressing the merits of this claim, the court conducts an independent

3    review of the record to determine whether the state court's decision was an objectively

4    unreasonable application of clearly established federal law.  Plascencia, 467 F.3d at

5    1198.

6                    (a)    Gordon argues that trial counsel failed to introduce photographs of

7    the Bristol Townhouse Apartments taken by Detective Elia that would have

8    contradicted Doe No. 1's testimony that she was forced to give petitioner a blowjob

9    in a chair in the apartment, whereas the photographs do not show a chair in the

10    room where Doe No. 1 was raped.  Traverse at 80 (citing Exs. 8 and 12; 11 RT

11    877–78).  Even assuming that counsel unreasonably failed to introduce these

12    photos to impeach Doe No. 1, Gordon fails to show a reasonable probability that,

13    but for counsel's unprofessional errors, the result of the proceeding would have

14    been different in light of the state court record, showing that trial counsel

15    impeached Doe No. 1 on cross-examination with her inconsistent accounts of the

16    oral copulation and other events the night she was raped.  See RT 919–23, 930–

17    31.  The trial court noted Doe No. 1's credibility problems, but considered all the

18    evidence and found Gordon guilty of forcible rape.  RT 1697–98.  Gordon has not

19    shown a reasonable probability that, absent the alleged error, the trial court would

20    have had a reasonable doubt respecting guilt.

21                    (b)    Gordon argues that trial counsel failed to introduce a memorandum

22    from Vincent Ghiringhelli, an investigator, to attorney Mervin Lernhart, reporting

23    that during a phone interview with Gordon's mother, Connie Gordon, she stated

24    that Doe No. 1 called her on May 30, 2009, berated her over the phone, and said

25    that Gordon "was going to 'go to prison forever.'"  Pet. at 59 and Ex. 31.  Gordon

26    argues that this written memorandum should have been introduced and that trial

27    counsel should have examined Doe No. 1 and Mrs. Gordon about the incident to

28    establish that Doe No. 1 was motivated to testify falsely against Gordon.  Traverse

at 80.  In light of the evidence in the state court record that Doe No. 1 had problems when she was living with her grandparents, <u>see</u> RT 1498, 1506–08, 1525, and that the trial court expressly noted Doe No. 1's credibility problems, RT 1697–98, Gordon has not shown a reasonable probability that, absent the alleged error, the trial court would have had a reasonable doubt respecting guilt.

(c)     Gordon contends that trial counsel failed to cross-examine Doe No. 2 about her use of methamphetamine while making a sex video with Gordon, after Gordon wrote a note to trial counsel stating that "during porn movie we used meth."  Traverse at 80 and Ex. 35.  Even assuming that trial counsel's performance fell below an objective standard of reasonableness by not asking Doe No. 2 about using methamphetamine while making the video to impeach her, Gordon has not shown a reasonable probability that, absent the alleged error, the trial court would have had a reasonable doubt respecting guilt in light of Maple's testimony that she and Doe No. 2 used methamphetamine together, particularly on the day of the rape.  RT 1416, 1422–24.

(d)     Gordon argues that trial counsel failed to introduce notes written by Gordon's father, Gil Gordon, after a discussion with investigator Ghiringhelli concerning "his best guess [as to what] they will testify to," Ex. 33, and failed to ask Gil and Connie Gordon to testify about the following factual issues: Doe No. 2's drug and alcohol problems; Doe No. 1's lack of credibility, probationary status, drug use and violations of her diversion contract; and Gordon's good and non-violent character.  Traverse at 80–81.  The state court addressed the merits of these arguments about trial counsel's failure to present certain evidence to impeach the victims and to show Gordon's good character, as raised in support of Claim 12.

> Trial counsel would have known of evidence showing Petitioner's negative character that would be introduced by the District Attorney in response to any introduction of evidence showing Petitioner's good character.  Further, as shown by Respondent, evidence of a

rape victim's character or prior sexual conduct is severely limited, and would have allowed introduction of the victims' statements to others for the truth as prior inconsistent statements. Trial counsel is not obliged to make futile or self-defeating arguments. In regard to evidence of drug impairment affecting memory, perception, and communication, the trial court did have evidence of concurrent and past drug and alcohol use by the victims. The drug use did not affect the court's analysis of credibility, because the victim's drug use was not concealed or denied by them or by others. Jane Doe #1 admitted impairment by alcohol, and it is unquestionable that the trial court would have considered this in evaluating both victims' testimony, since trial counsel argued the effect of intoxication, including motive to lie.

Pet., Ex. 60 at 25–26 (citing RT 1682–83, 1690–92). The state court's analysis is well-reasoned and relevant to the related claim that trial counsel failed to ask Mr. and Mrs. Gordon about these issues. Upon independent review of the record, the court determines that the state court's decision denying this ineffective assistance claim was not an objectively unreasonable application of clearly established federal law.

(e)　　Gordon contends that trial counsel failed to introduce evidence of Doe No. 1's diversion contract and probation, which she repeatedly violated by consuming alcohol. Pet. at 60 and Exs. 5 and 46. Based on factual statements made in Connie Gordon's Supplemental Declaration dated August 19, 2012, Ex. 46, Gordon argues that trial counsel should have impeached Doe No. 1's credibility and established her motive to fabricate allegations to avoid being found in violation of her diversion contract. Traverse at 81. At the evidentiary hearing in superior court on Gordon's state habeas petition, respondent explained that the prosecution "would not have been allowed to disclose a juvenile's probation terms for a misdemeanor at the time of trial." Pet. Ex. 75 at 19 (transcript of Apr. 18, 2014 hrg). As discussed with respect to related ineffective assistance arguments in Claims 7, 11 and 12, trial counsel presented other impeachment material and challenged Doe No. 1's credibility during the trial. While noting that Doe No. 1 had

United States District Court
Northern District of California

problems with credibility, the trial court found Gordon guilty of forcible rape after considering all the evidence.  RT 1697–98.

Gordon fails to show that trial counsel's performance was deficient or prejudicial on any of these grounds.  Having independently reviewed the record, the court determines that the state court's decision, denying the claim that trial counsel was ineffective for failing to introduce material evidence that was in his possession, was not an objectively unreasonable application of clearly established federal law.

Accordingly, Claim 13 is DENIED.

## V.     Claims Based on Challenging Sentence

Gordon asserts several claims based on challenges to the sentence imposed by the trial court.

### A.      Claim 14: Trial Court Sentencing Error

In Claim 14, Gordon contends that the trial court erred in sentencing her to a prison term of 49 years and 8 months to life with the possibility of parole, rendering the sentencing proceedings fundamentally unfair in violation of the Fifth and Fourteenth Amendments, and resulting in a sentence that was grossly disproportionate to the crime in violation of the Eighth Amendment.  The Supreme Court has recognized that sentencing courts must have wide latitude in their decisions as to punishment, subject to the constraints of the due process clause and the Eighth Amendment.  Lockyer v. Andrade, 538 U.S. 63, 72 (2003); Brothers v. Dowdle, 817 F.2d 1388, 1390 (9th Cir. 1987) (citing Gardner v. Florida, 430 U.S. 349, 358 (1977)).  In the order to show cause, the court limited the scope of this claim to assert an Eighth Amendment violation and dismissed the claim in part with respect to challenging the calculation of the sentence under state law.  Dkt. 18 at 7.  On further consideration, the court will review Gordon's allegations to the extent she challenges the sentence on due process grounds.

As the court of appeal denied this claim on procedural grounds, Pet., Ex. 77, and the state supreme court did not reach the merits of this claim, this claim is subject to de novo review.  See Amado v. Gonzalez, 758 F.3d 1119, 1131 (9th Cir. 2014).

### 1.    Due Process

Gordon argues that the trial court erred by finding that the rape and sodomy of Doe No. 2, charged in Counts 3 and 4, occurred on separate occasions because there was an "interlude there where the defendant thought about what he was doing" between the crimes, resulting in a finding that Counts 3 and 4 were separate acts pursuant to Cal. Penal Code 667.6(d).[3]  RT 2075–76.  The trial court determined that the crimes "have to be punished consecutively," and computed the indeterminate terms as 15 years to life as to Counts 1, 3 and 4, each to be served consecutively to the determinate term of four years and eight months, which was calculated from the upper term of four years on the domestic violence offense in Count 5 and a consecutive eight month term for the oral copulation offense in Count 2.  RT 2075–76.  Gordon argues that the trial court erred by not considering the evidence for purposes of determining whether consecutive sentences were warranted as to Counts 3 and 4.  Pet. at 63.

The constitutional guarantee of due process is fully applicable at sentencing.  See Gardner, 430 U.S. at 358.  A federal court may vacate a state sentence imposed in violation of due process; for example, if a state trial judge (1) imposed a sentence in

---

[3]    Section 667.6(d) provides in relevant part as follows:

>  (d) A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions.
>
>    In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions.
>
>    The term shall be served consecutively to any other term of imprisonment and shall commence from the time the person otherwise would have been released from imprisonment. . . .

Cal. Penal Code § 667.6(d).

excess of state law, see Walker v. Endell, 850 F.2d 470, 476 (9th Cir. 1987), or

(2) enhanced a sentence based on materially false or unreliable information or based on

a conviction infected by constitutional error, id. at 477.  Here, Gordon does not contend

that the sentence was unauthorized under state law.  Rather, Gordon challenges the

unreliability of Doe No. 2's account of the crimes to support the trial court's finding that

Gordon "had a reasonable opportunity to reflect upon his or her actions and nevertheless

resumed sexually assaultive behavior" under § 667.6, due to Doe No. 2's drug use prior

to the rape and her prior statements to Maple and investigating officers which failed to

mention that she and Gordon smoked between the sex acts, as she testified at trial.  Pet.

at 63.

The record reflects that trial court found Doe No. 2's testimony to be credible and

determined that the two crimes occurred on separate occasions.  RT 595–98, 2076.  The

trial court had evidence that Doe No. 2 used methamphetamine with Maple on the day of

the crimes, that Gordon testified and admitted that she "lied to everybody at some point"

and had "a problem with lying," RT 1661, and that Doe No. 2 testified that she and

Gordon smoked cigarettes after she ejaculated and that Gordon burned her with a lit

cigarette before she anally penetrated her, RT 594–601.  In light of the evidence in the

record, Gordon fails to demonstrate that the trial court's determination that the crimes

occurred on two separate occasions was unreasonable, or that the sentencing

determination violated due process.  See Watts v. Bonneville, 879 F.2d 685, 688 (9th Cir.

1989) (imposition of two sentences for rape in concert of same victim did not violate due

process because California punished the defendant for two separate criminal acts, not

twice for a single act).

### 2.    Cruel and Unusual Punishment

Gordon contends that her sentence is grossly disproportionate to the crimes in

violation of the Eighth Amendment, noting that the ordinary punishment for rape in

violation of Cal. Penal Code § 261, or for sodomy by force in violation of § 286, is three,

six or eight years.  Traverse at 84–85 (citing Cal. Penal Code §§ 264, 286(c)(2)).  This

1  argument disregards the provisions under Cal. Penal Code § 667.61 requiring a prison

2  term of 15 years to life for felony sex offenses under certain aggravated circumstances

3  which were charged in the special allegations.

4         Gordon argues that scientific research on brain development suggests that young

5  adults are less culpable than adults whose brains are fully developed, though she

6  concedes that she was 23 and 24 years old at the time of the crimes.  Traverse at 83–84;

7  Suppl. Traverse at 10.  She further argues that the sentence fails to account for the

8  numerous mitigating factors in her case, namely that she was molested and raped as a

9  young child, was given alcohol and marijuana by her older brother, and suffered from

10  repressed gender identity.  Traverse at 85–86 (citing Ex. 38).  Even considering the

11  entirety of Gordon's arguments and supporting evidence in support of her Eighth

12  Amendment challenge to the sentence, Gordon does not show under clearly established

13  federal law that these mitigating circumstances would have been material at sentencing

14  an adult for a non-capital conviction, particularly where the trial judge was mandated to

15  impose three consecutive indeterminate sentences by state law.  RT 2075.  See Miller v.

16  Alabama, 567 U.S. 460 (2012) (holding that the Eighth Amendment forbids mandatory life

17  without parole for juvenile homicide offenders under the age of 18); Graham v. Florida,

18  560 U.S. 48 (2010) (categorically banning life without parole for a juvenile convicted of a

19  nonhomicide offense).

20         Gordon further argues that her 49-year sentence is statistically equivalent to a life

21  term without possibility of parole, Traverse at 84, but fails to show that her sentence is a

22  rare or extreme case of a grossly disproportionate sentence.  See Andrade, 538 U.S. at

23  71 (upholding sentence of two consecutive terms of 25 years to life for recidivist

24  convicted most recently of two counts of petty theft with a prior conviction); Cacoperdo v.

25  Demosthenes, 37 F.3d 504, 508 (9th Cir. 1994) (sentence making the defendant

26  ineligible for parole for 40 years not grossly disproportionate when compared with gravity

27

28

United States District Court
Northern District of California

of sexual molestation offenses).  In light of the evidence and testimony presented at trial,[4] the trial court reasonably found that Gordon committed these crimes "to dominate, to humiliate, to control, to manipulate and in certain cases to actually hurt the people you were with," and even acknowledged that Gordon was surrounded by a "complicated family dynamic."  RT 2073.  The trial court also determined that "prison is mandatory under these circumstances," and noted that Gordon "demonstrated he can't follow the terms of probation and I consider him to be an extreme risk to people around him."  RT 2074.  Though Gordon considers a 49-year sentence to be unconstitutionally disproportionate to her sex offenses against two victims, she fails to show that hers is "'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.'"  Ewing v. California, 538 U.S. 11, 20 (2003) (quoting Harmelin v. Michigan, 501 U.S. 957, 1005 (1991) (KENNEDY, J., concurring in part and concurring in judgment)).

Gordon also raises a facial challenge to the constitutionality of the mandatory consecutive sentencing provisions of § 667.61, on the ground that the statute does not recognize gradations of culpability and fails to account for mitigating factors, but she fails to cite clearly established federal law in support of this claim.  Traverse at 66–67.

For the reasons set forth above, Gordon has failed to show that the state court's rejection of her due process and Eighth Amendment challenges to the sentence was contrary to, or an unreasonable application of, clearly established federal law.  Claim 14 is therefore DENIED.

## B.  Claim 15: Ineffective Assistance of Trial Counsel in Failure to Object to Sentence

In Claim 15, Gordon argues that trial counsel was ineffective for failing to object to

---

[4]     Respondent cites confidential portions of the clerk's transcript in response to Claim 14, Answer at 44-45, but did not lodge these sealed probation reports with the court. Gordon did not address these sealed portions of the record in the traverse.  Accordingly, the court does not rely on these statements in the sealed records cited by respondent in reviewing Gordon's claim for habeas relief.

the trial court's sentencing errors and for failing to introduce evidence supporting a lesser sentence. Pet. at 68–70. The court looks to the findings of the superior court as the last reasoned state court decision to address the merits of these claims. Pet., Exs. 60, 76, 79.

Gordon contends that trial counsel's failure to investigate the mitigating circumstances of Gordon's sexual abuse by her brother, the origins of her substance abuse, and her productive role as a line chef was deficient and prejudicial. Traverse at 87. Gordon contends that trial counsel failed to submit a sentencing memorandum and failed to introduce evidence to show that the sex offenses against Doe No. 2 were a single course of events and did not occur on separate occasions that would warrant consecutive sentences. Pet. at 69–70. Gordon also argues that trial counsel failed to object to her sentence as grossly disproportionate in violation of the Eighth Amendment, which had the prejudicial effect of forfeiting the argument on appeal. Traverse at 87–88.

The state court denied this ineffective assistance claim upon finding that the trial court reasonably concluded that Gordon had the time and opportunity to form separate intents and acts from Doe No. 2's testimony. Pet., Ex. 60 at 29–30. The state court also made the following findings:

> First, trial counsel did specifically oppose the assertions of the District Attorney's sentencing statement orally, so there is no reason to believe that failure to produce a written statement was necessary, or harmed Petitioner. Further, Petitioner may have been abused as a child, and he may suffer from drug and alcohol abuse, but the trial court's reasoning for imposing such a lengthy sentence was its conclusion that Petitioner was not capable of changing, due to his lengthy history of cruelty toward others, and that society needed protection. This would be true regardless of the origin of Petitioner's propensities, so no harm occurred, and the trial court was entitled to use its evaluation of Petitioner's character in imposing the sentence.

Pet., Ex. 60 at 30. In light of the evidence presented in the state court proceedings, the decision of the state court denying this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Claim 15 is therefore

64

DENIED.

## C. Claim 16: Ineffective Assistance of Appellate Counsel

In Claim 16, Gordon alleges that appellate counsel was ineffective for failing to raise on appeal the arguments raised in Claim 8 alleging improper admission of hearsay evidence[5] and Claim 14 challenging the sentence on due process and Eighth Amendment grounds. Pet. at 70–71. The court looks to the superior court's findings as the last reasoned state court decision to address the merits of these claims. Pet., Exs. 60, 76, 79.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. Evitts v. Lucey, 469 U.S. 387, 391–405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland. Smith v. Robbins, 528 U.S. 259, 285 (2000). First, the petitioner must show that appellate counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that appellate counsel acted unreasonably in failing to discover and brief a merit-worthy issue. Smith, 528 U.S. at 285. Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issues, the petitioner would have prevailed in his appeal. Id. at 285–86. Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by the defendant. See Jones v. Barnes, 463 U.S. 745, 751–54 (1983). The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989).

Gordon contends that appellate counsel failed to appeal on potentially meritorious arguments that (1) the trial court committed error by admitting hearsay testimony by Maple that Doe No. 2 feared Gordon, RT 1417, and (2) the trial court committed error at

---

[5] Claim 8 was dismissed for failure to state a cognizable ground for federal habeas relief. Dkt. 18 at 6-7.

sentencing by imposing consecutive sentences on Counts 3 and 4 upon finding they were committed on separate occasions and by imposing a sentence that was grossly disproportionate to the crimes. Pet. at 42–43, 62–68.

The superior court addressed the merits of Gordon's claim that the trial court erred by allowing Maple's testimony about Doe No. 2's statements that she was worried about Gordon. Pet., Ex. 60 at 18–19. The state court found no error in allowing Maple's testimony for non-hearsay purposes under the fresh complaint exception to the hearsay rule to establish that a complaint of the rape had been made near the time of the rape, and to show Maple's state of mind on hearing it. Id. The superior court concluded that "the trial court was certainly able to distinguish the purpose of the testimony and to consider it only for the stated non-hearsay purposes. Furthermore, Jane Doe #2 was still available for examination, so no violation of the right to confrontation occurred." Id. at 19. In light of the state court record, the state court reasonably denied the claim that appellate counsel was ineffective by not raising this non-meritorious hearsay argument on appeal.

With respect to the claim that appellate counsel was ineffective for failing to raise the due process and grossly disproportionate challenges to the sentence on appeal, appellate counsel's failure to raise these non-meritorious arguments on appeal did not amount to deficient performance or cause prejudice, for the reasons discussed with respect Claim 14, above. Barnes, 463 U.S. at 751–54.

Accordingly, Claim 16 is DENIED.

## VI.    **Brady Claim**

In Claim 17, Gordon alleges that the prosecution committed misconduct by failing to disclose material and exculpatory evidence prior to trial in violation of her due process rights as set forth in Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. As the court of appeal denied this claim on the merits without a reasoned decision, the court looks through to the reasoning of the superior court denying this claim. Wilson, 138 S. Ct. at 1193–96.

In <u>Brady</u>, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The Supreme Court has since made clear that the duty to disclose such evidence applies even when there has been no request by the accused, <u>United States v. Agurs</u>, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Cone II</u>, 556 U.S. at 469–70. "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine confidence in the outcome of the trial.'" <u>Smith v. Cain</u>, 565 U.S. 73, 75–76 (2012) (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995)). For a <u>Brady</u> claim to succeed, (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) that evidence must have been suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice must have ensued. <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004); <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82 (1999).

During the state habeas proceedings, Gordon moved for post-conviction discovery after the superior court issued an order to show cause on her amended state habeas petition, which she filed January 20, 2012. <u>See</u> Pet., Ex. 51. After the parties conferred on the discovery requests, respondent disclosed several items that were not disclosed before trial:

> (1)     Audio recording of Gordon's arrest. Pet. at 71 and Ex. 67. Gordon contends that this recording is material because it contains statements by one of the arresting officers that Gordon smelled like alcohol, which supports the suppression of her interrogation statements under <u>Miranda</u>. <u>See</u> Pet., Ex. 75 at 25.

(2)    Video recording of police interview of Doe No. 1. Pet. at 71 and Ex. 11. Gordon contends that this video is material because it contains prior inconsistent statements by Doe No. 1 that discredit her testimony.

(3)    Digital results of Doe No. 1's blood alcohol content on November 16, 2008. Pet. at 72 and Ex. 9. Gordon contends this evidence that Doe No. 1's BAC was .14 percent establishes a motive for her to fabricate the allegation that she was raped to avoid punishment for violating the terms of her diversion contract and probation.

(4)    Audio recording of Detective Elia's interview with Dylan Palmer. Pet. at 72 and Ex. 10. As argued by Gordon, Palmer stated that when he talked to Gordon by phone on the night of the rape, Doe No. 1 was not yelling and nothing appeared wrong, which would have established that Gordon was not holding Doe No. 1 against her will and that Doe No. 1 was motivated to falsely testify that Gordon raped her to avoid the repercussions of violating the terms of her probation.

(5)    Timothy Grabner's criminal history. Pet. at 72 and Ex. 36. Gordon contends that Grabner's prior convictions and arrest could have been admitted to impeach his credibility.

Gordon contends that there is a reasonable probability that, if this evidence had been disclosed to the defense, the result of the trial would have been different, and that the prosecution's failure to turn over the evidence before trial violated due process under Brady. Traverse at 93–96.

The state court heard argument from habeas counsel about the materiality of the previously undisclosed evidence and denied the Brady claim, which was presented as claim 36 in the superior court habeas proceedings and briefed by the parties. See Pet., Ex. 75 at 7. The state court found that the evidence was not material under Brady and denied the habeas claim for the following reasons:

(1)    The state court found that the audio recording by Officer Walund of

68

1    Gordon's April 1, 2009, arrest and transport by police car containing

2    statements by the officer that Gordon smelled like alcohol, and Gordon's

3    admission to drinking alcohol, was not material to the <u>Miranda</u> challenge to

4    Gordon's interrogation statements because "evidence of intoxication is

5    contained in the tape of the interview, which is the crucial aspect . . . to

6    show that Mr. Gordon didn't knowingly or understandingly waive his

7    Miranda rights." Pet., Ex. 75 at 25–29. The state court reasoned that the

8    comments during the arrest and transport did not have "any real effect,

9    because should the intoxication be shown, it would have been shown by the

10   interview, itself." Pet., Ex. 75 at 29.

11   (2)   With respect to the video recording of Doe No. 1's police interview,

12         reflecting her prior statements admitting (a) that she was drinking and was

13         on probation and (b) that she initiated kissing Gordon and did not object to

14         having sex with Gordon for over five minutes, Pet., Ex. 75 at 9–19, the state

15         court found that this was not material because (a) "enduring a preliminary

16         hearing, trial, police interviews, medical evaluation, and [ ] all the other

17         things that Jane Doe 1 endured to be a part of this prosecution does not

18         persuade me that this could possibly have caused her to conceal from

19         probation she had been drinking;" and (b) "consent or mistaken consent

20         was thoroughly explored by defense, and raised as a defense [and the trial

21         court] had awareness and ability to evaluate that issue." <u>Id</u>. at 19.

22   (3)   With respect to the digital results of Doe No. 1's BAC, the state court

23         reiterated that the evidence was not material to explain bias or motive

24         because a motive to conceal alcohol use from probation could not possibly

25         cause Doe No. 1 to endure the prosecution of this case. Pet., Ex. 75 at 20.

26   (4)   With respect to the audio recording of Detective Elia's phone interview of

27         Palmer, the state court did not make a specific finding on the lack of

28         materiality. <u>See</u> Pet., Ex. 75 at 20. However, Gordon concedes that there

was no evidence that Doe No. 1 claimed to be yelling at the time Gordon

called Palmer, and withdraws the argument that Doe No. 1's statement was

inconsistent with Palmer's statements to Detective Elia on that issue.

Traverse at 66.

(5)     With respect to Grabner's criminal history, Pet., Ex. 75 at 20–24, the state

court determined that Grabner's prior misdemeanor convictions were not

material, upon finding that Grabner was a minor witness and the trial judge

made clear "that he based his finding of guilt on what the victims said, and

their credibility." Id. at 24.

In light of the state court record, the state court's decision denying the Brady claim was

not contrary to, and did not involve an unreasonable application of, clearly established

federal law.  Claim 17 is therefore DENIED.

## VII.  Cumulative Effect

In Claim 20, Gordon argues that the cumulative effect of the errors in her trial,

appellate and post-conviction proceedings violated her right to due process. Pet. at 85–

86; Suppl. Traverse at 99–100. "'[P]rejudice may result from the cumulative impact of

multiple deficiencies.'" Harris v. Wood, 64 F.3d 1432, 1438 (9th Cir. 1995) (quoting

Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)).  The court has

reviewed the various deficiencies alleged by Gordon and determines there is no

reasonable probability that, absent the deficiencies, the outcome of the trial, direct

appeal, or state habeas proceedings would have been different so as to undermine

confidence in the outcome.  As the state court recognized on post-conviction review, this

case came down to the testimony of Doe No. 1 and Doe No. 2, whose credibility was

challenged and notably considered by the trial court.  All the additional credibility issues

that Gordon has identified in her habeas petition to further impeach the victims are not

only cumulative, but they are also overshadowed by Gordon's own lack of credibility, as

found by the trial judge and reflected in the transcript of her testimony.

Having reviewed the state court record, particularly the transcripts of the trial and

United States District Court
Northern District of California

the state court's post-conviction evidentiary hearing, the court determines that the combination of the harmless errors identified by Gordon did not have a synergistic and cumulative effect so as to render her trial unfair. See Ybarra v. McDaniel, 656 F.3d 984, 1001 (9th Cir. 2011). Accordingly, Claim 20 is DENIED.

## VIII. Requests for Evidentiary Hearing

Gordon seeks an evidentiary hearing on factual issues raised by Claims 1, 2, 3, 4, 7, 9, 11, 12, 13, 14, 15, 16 and 20. Dkts. 38, 74. Respondent opposes the requests for an evidentiary hearing. Dkts. 41 and 75.

Section 2254(e)(2), governing evidentiary hearings, provides:

> If the applicant has failed to develop the factual basis of a claim in state court proceedings, the court shall not hold an evidentiary hearing unless the applicant shows that:
> (A) the claim relies on–
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

The Supreme Court has interpreted this section to provide that where a petitioner has indeed exercised diligence to "develop the factual bases" of his claims in state court, the requirements of section 2254(e)(2)(A) & (B) do not apply to his request for an evidentiary hearing. Williams (Michael Wayne) v. Taylor, 529 U.S. 420, 435 (2000); Holland v. Jackson, 542 U.S. 649, 652–53 (2004).

Gordon contends that there was no lack of diligence triggering the stringent standards of § 2254(e)(2) because she previously sought an evidentiary hearing in state court and was denied the opportunity to develop the factual bases for her claims asserting improper admission of evidence at trial, ineffective assistance of trial and appellate counsel, Brady violations, and grossly disproportionate sentence. Though

71

respondent disputes whether Gordon was denied an opportunity to develop these factual allegations in state court, Gordon has sufficiently demonstrated diligence in requesting an evidentiary hearing in state court on the factual issues presented here.

Having avoided the restrictions of § 2254(e)(2), Gordon would qualify for an evidentiary hearing under the "pre-AEDPA" standard if she alleges facts, that if proven, would entitle her to relief and the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts. See Jones v. Wood, 114 F.3d 1002, 1010 (9th Cir. 1997). "In other words, petitioner must allege a colorable constitutional claim." Turner v. Calderon, 281 F.3d 851, 890 (9th Cir. 2002). There is no "per se rule requiring an evidentiary hearing whenever a petitioner has made out a colorable claim, though." Id. "Rather, a petitioner must establish that his allegation . . ., if proven, would establish a constitutional deprivation." Id. "Entitlement to an evidentiary hearing based on alleged ineffective assistance, for example, requires a showing that if [petitioner's] allegations were proven at the evidentiary hearing, deficient performance and prejudice would be established." Id.

Applying this "pre-AEDPA" standard for an evidentiary hearing on the factual issues, the court determines that Gordon fails to allege facts, that if proven at an evidentiary hearing, would entitle her to relief. Dkt. 38 at 7–14. Further, as a discretionary matter, the court considers that an evidentiary hearing is not warranted in light of the state court record which reflects that Gordon had an opportunity to develop substantial factual issues in the course of the habeas proceedings and that the state court thoroughly considered Gordon's habeas claims and conducted several hearings, including an evidentiary hearing with testimony by several Napa police detectives, an officer and a medical department manager for the Napa Department of Corrections, Gordon's parents and friend, and Gordon herself. It is not clear to the court "what more an evidentiary hearing might reveal of material import." See Gandarela v. Johnson, 286 F.3d 1080, 1087 (9th Cir. 2002) (denying petitioner's request for evidentiary hearing regarding his assertion of actual innocence). Because the claims may be resolved by

reference to the state court record and the documentary evidence submitted by Gordon, the court denies her requests for an evidentiary hearing. See Campbell v. Wood, 18 F.3d 662, 679 (9th Cir. 1994).

Particularly with respect to the newly exhausted evidence of gender dysphoria presented in support of Claims 2 (Miranda violation), 9 (involuntary and unreliable jailhouse letters), 12 (ineffective assistance in failing to object to introduction of jailhouse letters as involuntary and unreliable) and 14 (sentencing error), the court determines that, because the claims may be resolved by reference to the record and the exhibits themselves, an evidentiary hearing is not warranted by this new evidence on the questions of the voluntariness of Gordon's Miranda waiver, the voluntariness or reliability of the admissions in her jailhouse letters, or the fundamental fairness or gross disproportionality of her sentence which was mandated, for the most part, by state statute.

Accordingly, Gordon's requests for an evidentiary hearing are DENIED.

## CONCLUSION

For the reasons set forth above, Gordon's second amended petition for a writ of habeas corpus is DENIED. This order fully adjudicates the petition and terminates all pending motions. The clerk shall close the file.

## CERTIFICATE OF APPEALABILITY

To obtain a certificate of appealability, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward. "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard. Here, the court finds that Claims 1, 2, 3, 4, 7, 9, 11, 12, 13, 14, 15, 16, 17, 19 and 20 presented by

Gordon in the second amended petition meet that standard and GRANTS the COA as to those claims. With respect to the remaining claims of the second amended habeas petition, the court DENIES a COA. See generally Miller-El, 537 U.S. at 335-38.

**IT IS SO ORDERED.**

Dated: January 2, 2020

 /s/ *Phyllis J. Hamilton*
PHYLLIS J. HAMILTON
United States District Judge